Argued February 4, affirmed as modified September 10, 1971

ELLE ET AL, *Respondents, v.* BABBITT ET AL,
*Defendants,* BEALL PIPE AND TANK
CORPORATION, *Appellant.*
488 P2d 440

*John H. Arenz,* Portland, argued the cause for appellant. With him on the briefs were George W. Mead and Harvey S. Benson, Portland.

*James R. Moore,* Portland, argued the cause for respondents. With him on the brief were Souther, Spaulding, Kinsey, Williamson & Schwabe and Ridgway K. Foley, Jr., Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, HOWELL and BRYSON, Justices.

McALLISTER, J.

This suit for an accounting was brought against Beall Pipe and Tank Corporation by three partners of a partnership known as The Pipe Machinery Co., for the benefit of all the partners thereof. The other 16 partners were named as defendants. The dispute arose out of the leasing of two pipe mills by the partnership to Beall and the termination of the lease. Beall appeals from the decree of the trial court.

Beall Pipe and Tank Corporation is a family-owned corporation, which for many years has been engaged in making pipe in Portland. John E. Beall

was president and chief executive officer of the corporation and owned about 55 percent of its stock. His cousin, Franklin Beall, was the executive vice president and owned about 40 percent of the corporate stock. We will refer herein to Beall Pipe and Tank Corporation as the corporation or as Beall and to the individual Bealls by their full names. We will refer to The Pipe Machinery Co. as the partnership.

Beall formerly manufactured pipe by the "can" method. In 1953, Beall decided that it should acquire a modern tube mill for making welded steel pipe. In such a mill a continuous sheet of steel is fed into a machine which gradually bends the steel into a circle and welds it into a tube which is then cut into desired lengths. The rolls and guides which bend the sheet steel into a tube are known as "tooling." Pipe of various dimensions can be made by changing the tooling.

Beall did not have enough capital to buy a tube mill and John Beall proposed that a partnership be organized to buy the tube mill and lease it to the corporation. The partnership was formed on April 1, 1954, and was comprised of John Beall, Franklin Beall and five employees of the corporation. Later in 1954, eight additional partners were added, all of whom were Beall employees, except W. H. Kipp, Jr., who was a Beall customer. At a later date, W. H. Kipp, Sr., became a partner and there were other minor changes in the partnership personnel, but those changes have no bearing on the issues in this case.

The first pipe mill was built in the Beall plant by the Monarch Forge Company of Portland and paid for by the partnership. As built, the mill was designed to make pipe from 6 to 16 inches in diameter. The

mill was leased by the partnership to Beall for a royalty of one cent per inch of diameter for each lineal foot of pipe produced by the mill. A written lease was entered into under date of April 1, 1954, with an initial term of one year giving Beall the option to extend the lease from year to year for 10 years.

Later the partnership purchased a second mill known as the "through-put" mill designed for the manufacture of pipe from 16 to 42 inches in diameter and leased it to the corporation. A new lease covering both mills was executed on April 1, 1957, which provided for the payment of royalties for the pipe produced by both machines according to the original formula of one cent per inch of diameter for each lineal foot of pipe. The lease also provided:

"Lessee also agrees to pay to Lessor an additional rental in the sum of $500.00 per month for the use of the pipe mill designed to fabricate pipe in the sizes from 16″ to 42″ [the "through-put" mill]."

Sometime prior to April 1, 1965, Beall decided to terminate its lease of the partnership mills and offered to buy both mills from the partnership. The offer was refused by some of the partners and while the parties were negotiating about the price a new lease was executed dated April 1, 1965. The new lease reduced the royalties for the use of each mill to .775 cents per inch of diameter for each foot of pipe. It made no provision for the $500 a month "additional rental" and expired by its terms on April 1, 1966.

When Beall's final offer to purchase the mills was rejected, the corporation decided to build a new mill. The new mill was not ready on April 1, 1966, and by oral agreement the corporation continued to use

the partnerships mills until August 1, 1966, when Beall's own mill, referred to in the record as the replacement mill, was ready for use.

There is little dispute about the foregoing facts. Additional facts will be discussed in connection with the various assignments of error.

The first three assignments of error concern the plaintiffs' charges that in building its own pipe mill, Beall copied the original partnership 6 to 16 inch mill and should be required to account to the partnership for the value of the design and engineering which was copied. The trial court found that the copying had taken place and awarded the partnership $27,000 on that account. Beall contends that the trial court erred in finding that the corporation copied the partnership mill and that, in any event, it was entitled to copy the mill if it wished. Beall also objects to the amount awarded the partnership on account of the alleged copying.

There was a great deal of evidence introduced at trial on the issue of the copying of the partnership mill, and much of it was conflicting. We agree with the trial court that the weight of the evidence shows some copying of specifications and measurements. We turn, then, to the question of whether Beall had a right to use this information.

Plaintiffs rely on two basic arguments. The first, derived from *Kamin v. Kuhnau et al,* 232 Or 139, 374 P2d 912 (1962), is that the engineering and design information was made available to Beall under circumstances raising a duty on its part not to use that information for its own advantage. Such a duty was found to exist in *Kamin,* on two bases. First, the information imparted to Kuhnau consisted of Kamin's ideas for a new invention. It later developed that

Kamin's idea had been anticipated by others, but was not yet known in the Oregon marketing area. The decision holds that for information to be confidential and protected from appropriation by another it need not be of "patentable novelty". The court nevertheless found it significant that the new idea was not known locally and that both the plaintiff and the defendant apparently thought it completely original. The second basis was the relationship of the parties— Kamin, the inventor, hired Kuhnau to assist in the development of the idea and the subsequent manufacture of the resulting product. In this setting, this court held that the defendant's use of the information for his own benefit, by manufacturing and selling a product based on plaintiff's idea, was unfair to the plaintiff and should be enjoined.

In the present case plaintiffs have conceded that there was nothing in the nature of a trade secret or invention involved. The principles used in the design and engineering of pipe mills are known throughout the world. The original mill owned by the partnership was unique only in the sense that each installation of a pipe mill requires its own engineering to install the mill in the location and plant provided for its use. Any copying of the original mill would have saved the corporation money which would otherwise have to be expended in engineering and design costs, but it would not have been an appropriation of concepts or ideas not generally known. According to one of the plaintiffs' witnesses, the best way to design a tube mill was to visit and inspect tube mills throughout the world and to incorporate in the desired mill the best methods observed in other mills. There is nothing in the record to indicate that the partnership's mills were not open to inspection and copying by anyone interested.

1, 2. If there is any reason why the corporation should not have used the information in question, it must be found in the relationship between the parties, and not in the nature of the information itself. No cases have been cited or discovered which suggest that one who leases unpatented equipment from another is under a duty not to use for his own benefit any information about the equipment obtained during the term of the lease. At least under the circumstances of this case, no such duty should be imposed by virtue of the lessor-lessee relationship. The partnership was formed, at the instigation of the corporation, for the purpose of financing a pipe mill to be designed for the corporation's exclusive use. The partnership did not, at the outset, have a mill that suited the corporation's purposes. The only item the partnership had that the corporation needed was money.

It is not clear that the partnership ever owned the "information" which plaintiffs contend the corporation improperly used. It clearly appears that the pipe mill was built for Beall by Monarch Forge. There is no direct evidence on the point but the inference is clear that the partnership made no contribution toward the design or engineering of the mill except to pay for it. The design and engineering seemed to have been worked out by Beall and Monarch to the end that Beall got the mill it wanted. Presumably the price charged the partnership included the cost of the design and engineering, but the drawings and specifications were not turned over to the partnership along with the completed mill. They were kept by Monarch, and there was no evidence that the engineering information about the mill was ever considered partnership property.

While Beall had exclusive possession and control of the mill there was no limit on its right to examine,

inspect, measure, photograph or otherwise use the mill. On the contrary, Beall was under a duty to inspect, repair and maintain the mill and to recondition or replace all worn and defective parts. It was undisputed that during the 12 years that Beall used the mill, it was improved and modernized by Beall, partly at Beall's expense, but mostly at the expense of the partnership. It was also undisputed that after a bad fire in 1961 Beall, using the partnership insurance proceeds, completely rebuilt the mill.

This case is more nearly controlled by *Prentice Dryer v. Northwest Dryer,* 246 Or 78, 424 P2d 227 (1967), in which it was held that no unfair appropriation of information had taken place. The same two elements were considered and evaluated; the nature of the information was not in the nature of a trade secret, as had been the case in *Kamin,* but was general information and expertise in a particular field; the relationship was that of employer and employee. Finding that no confidential information had been disclosed to the employee, and that he had not agreed to refrain from using information gained during his employment, the court held there was no unfairness to the employer when the employee later used his general knowledge in the service of a competing employer.

3. The above discussion has disregarded the fact that the same persons controlled the affairs of both the partnership and Beall. The evidence discloses that the partnership business was conducted in Beall's office during the years covered by the leases, and that, except for John and Franklin Beall and a few of Beall's key employees who were members of the partnership, the partners took no active part in the affairs of the partnership. These were left largely to the management of John Beall. This factor is the important ele-

ment in plaintiffs' second argument; that the design information belonged to the partnership and that no partner had a right to use it for his own benefit. Plaintiffs contend that John Beall and the other partners who acted for Beall had no right to permit the corporation to use this information for Beall's benefit at the expense of the partnership. Plaintiffs further contend that Beall should account to the partnership for whatever it gained by knowingly participating in this breach of fiduciary duties.

4. It is well established that a partner may not use for his own benefit information or opportunities which properly belong to the firm. *Fouchek et al v. Janicek*, 190 Or 251, 225 P2d 783 (1950). However, as pointed out above, we find that the partnership did not own any information as such; it owned a machine, and the details of the machine's design were made readily available to Beall by the terms of the lease itself. Under these circumstances the partners who were also active on behalf of Beall had no duty to prevent Beall from using whatever information could be gained from the observation and measurement of the pipe mill. The partnership had no exclusive or confidential information which its members were obliged to protect.

We conclude that the partnership was not entitled to the $27,000 awarded plaintiffs on its behalf on account of the copying of parts of the original partnership mill.

5, 6. The next question concerns a claim for unpaid royalties in the amount of $8,289.62, which the trial court allowed. This claim arose out of the following circumstances. In May, 1963, Beall was preparing a bid on a large job for Cascade Natural Gas. It was known that competition would be keen, and that a low

bid would be necessary in order to get the job. Ralph Elle, one of the plaintiffs, worked for Beall at that time as its chief engineer and estimator. He testified that he prepared the estimates upon which this particular bid was based, and that it appeared that Beall's bid could not be low enough to get the job unless the royalties paid to the partnership were cut in half. This was discussed at a meeting held at the Beall plant, attended by John Beall, Franklin Beall, plaintiff Elle and Ben Wilkins, Beall's sales manager, who was also a partner. It was decided to bid on the basis of a 50 per cent royalty and Beall obtained the job. For the pipe produced for this job, the partnership was paid only half the usual royalty and plaintiffs claim the other half of these royalties on behalf of the partnership in the amount of $8,289.62.

No meeting of all the members of the partnership was called to discuss this cut in royalty, nor were the other partners formally notified or their agreement sought. When some of the other partners learned what had happened they complained to Elle, who referred them to John Beall. There is no evidence that any complaints were ever made to Mr. Beall.

Plaintiffs do not contend that there was any fraud or bad faith involved, but vigorously contend that the partners who decided to reduce the partnership royalties on the Cascade job were, in fact, acting for Beall, and that they had no authority to agree to the reduced royalty payments on behalf of the partnership.

The management of partnership affairs in its dealings with third parties is governed in part by statute. ORS 68.310 provides:

"The rights and duties of the partners in rela-

tion to the partnership shall be determined, subject to any agreement between them, by the following rules:

\* \* \* \* \*

"(5) All partners have equal rights in the management and conduct of the partnership business.

\* \* \* \* \*

"(8) Any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners; but no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners."

The power of a single partner to bind the partnership in dealings with third parties is covered by ORS 68.210:

"(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

\* \* \* \* \*

"(4) No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction."

Plaintiffs claim that the partners who were not consulted about the royalty reduction were deprived of their right to participate equally in the management of the partnership business. The rule stating this right is, however, subject to any agreement among the partners. ORS 68.310. The members of a partnership

may, if they wish, agree to leave the management of the business in the hands of a single managing partner. Crane on Partnership 348; Mechem, Elements of Partnership (2d ed, 1920) 247, § 278. Such an agreement may be implied from the parties' course of conduct. *Parks v. Riverside Insurance Company of America,* 308 F2d 175, 180 (10th Cir 1962); Mechem, op. cit. supra at 248.

It is clear from the testimony in this case that most of the partners never concerned themselves with the management of partnership affairs. The following is quoted from the testimony of William Kipp, Jr., one of the plaintiffs:

"Q   And insofar as you know, during this period of time, that there was no meetings of the partnership from 1958 to 1965, do you know of any other of the partners who had any—did anything affirmatively for the benefit of the partnership other than Mr. Elle possibly or Mr. Beall—John Beall?

"A   No.

"Q   In other words, all the partners did, the eighteen or nineteen partners during this period of time were to put up the money initially for their original investment and receive the profits each year, is that right?

"A   It sounds a little ridiculous but that is the facts."

During the years the partnership leased the pipe mills to Beall the partnership's affairs were handled by those partners who were management-level employees and officers of Beall under the direction of John Beall. None of the partners ever objected to this manner of conducting the partnership business; John Beall became, by tacit agreement among all the partners, the managing partner with authority to conduct

the ordinary business of the partnership. See *Miller
v. Ashley & Rumelin,* 127 Or 215, 271 P 596 (1928), in
which this court held that plaintiff, who allowed his
copartner to conduct all of the firm's financial affairs
for several years, could not contend that his partner
was without authority to bind the firm in a particular
transaction:

> "* * * It was not necessary that direct au-
> thority be conferred by one partner upon the other
> to transact such business as is usually transacted
> by a commercial partnership. The fact that the
> business of a nontrading partnership is conducted
> in a certain manner for a number of years is very
> convincing evidence that both parties acquiesced in
> and assented to that manner of doing business. If
> one partner transacts a certain line of business
> necessary to the promotion of the partnership af-
> fairs for a number of years without objection from
> the other partner we may conclude that the former
> was authorized by his partner to so transact the
> business. * * *" 127 Or at 221-222.

In the present case the decision to agree on behalf of
the partnership to a temporary reduction in royalty in
order to enable Beall to make a successful bid on a
large job was clearly part of the ongoing management
of the partnership's business affairs. John Beall, by
virtue of the other partners' long acquiescence in his
exercise of management, had the authority to make
that decision and to bind his copartners by agreement
with Beall. It is also significant that the plaintiff Elle
agreed to the reduction in royalty and so testified. It
appears that the other partner Wilkins either agreed
or did not object.

The award of $8,289.62 for unpaid royalties was in
error.

7. The next question concerns the trial court's

award of $4,500, which it held the corporation owed the partnership as additional rental for the through-put mill for the period July 1, 1961, through April 1, 1962. The lease in effect during this period provided for the payments of such additional rental at the rate of $500 a month. The testimony indicates that this $500 a month charge in addition to the royalties was agreed to because the mill was used only intermittently and because a roll which was a component part of this mill could also be used independently of the mill in the manufacture of non-royalty items.

It also appears that a very serious fire occurred at the Beall plant in June, 1961, and that the plant was shut down for some time for repairs. The precise period during which the partnership's mills were not being used does not appear in the record; however, the briefs assume that this period coincides with the period for which the $500 a month additional rental is contested here, and we will also assume that the through-put mill was out of operation on account of the fire during all of this period.

Beall's comptroller, Dennis Reiter, testified that Beall did not pay this $500 rental charge during the time in dispute. There is some testimony that the partnership did receive the proceeds of some "use and occupancy" insurance paid for by Beall, but the amount of those proceeds and the items they were intended to cover does not appear. We agree with the trial court that the evidence indicates the additional rental was not paid during this period.

Beall argues that there was no obligation to pay the monthly rental during the period the mill could not be used because of fire damage, pointing to the language in the lease that the rental is "for the use of"

the through-put mill. Considering the testimony, mentioned above, about the purpose of this rental charge, we do not think the parties intended this language to limit the rental to months in which the through-put mill was used or could be used. One of the reasons for the additional rental was that the mill was not expected to be used continually; in the absence of any provision excusing the rental when the plant was not operating or the mill could not be used, we think the obligation to pay rental continued. The award of $4,500 for additional rental will be affirmed.

8. Plaintiffs also claimed that Beall owed the partnership the $500 a month additional rental on the through-put mill from April 1, 1965, to the time of trial. The lease executed on April 1, 1965, omitted the provision for additional rental, but there was testimony that that paragraph was omitted by mistake, and the trial court so found. Beall does not challenge, on appeal, the award of the $500 a month additional rental from April 1, 1965, to August 1, 1966, the date on which the lease, as extended by oral agreement between the partnership and Beall, expired. The trial court's award, however, also included the period between August 1, 1966, and January 1, 1967. This portion of the award, Beall claims, was not justified. We agree.

The agreement between the parties for the payment of this rental was no longer in force, and the evidence shows no other basis for such a charge. The through-put mill remained set up in Beall's plant during this period, but there is no evidence that it was used by Beall after August 1 (except that the roll belonging to the through-put mill was used for about one hour during August). John Beall testified that the mill was left set up so that it could be shown to po-

tential purchasers. The terms of the lease gave the partnership the right to remove the mill within 60 days of the expiration of the lease; it was not removed, but there was no evidence that it was left on the premises for Beall's use. We find no basis in the evidence for charging Beall rental on the machine after August 1, 1966, and the trial court's award will be reduced in the amount of $2,500.

9. Plaintiffs' final claim involved a cutoff saw which was a part of the original partnership mill. The saw was damaged in the 1961 fire; after the fire Beall purchased a new saw, at a cost of $20,500. Plaintiffs claim that the new saw is the property of the partnership; Beall claims that it is corporate property, and is using the saw on its new pipe mill.

Beall eventually had the original saw repaired, but not until several years after the fire. We agree with the trial court's conclusion that the evidence indicates the new saw was purchased with insurance proceeds received on behalf of the partnership and that it became part of the partnership mill. The trial court concluded, however, that Beall had misappropriated the insurance proceeds and awarded the cost of the new saw, $20,500, with interest from February 26, 1962, the date of its purchase. This was error.

Plaintiffs indicated several times during the trial that they were claiming the saw, not the insurance money. All of the insurance was collected by Beall and spent on repair and replacement of the equipment damaged in the fire. There is no claim by plaintiffs that any of these expenditures were improper.

Plaintiffs complain only about Beall's continued use of the saw after the expiration of the lease and its refusal to acknowledge that the saw belonged to

the partnership. It is a conversion of the saw at the end of the lease, not the earlier misappropriation of any of the insurance money, which is the proper basis for recovery by the partnership. The evidence established that at the time of the conversion the saw was still worth more than $20,500. The interest on the award should begin August 1, 1966.

10. Beall contends that the award was outside the scope of the pleadings. As to the theory of misappropriation of insurance proceeds, this contention is correct, but we have disapproved that theory. As to a theory of conversion, we hold that the pleadings were adequate to support the award. Plaintiffs' original complaint alleged Beall's possession of the saw after the expiration of the lease, and that the partnership should be reimbursed for the value of its use. After trial, however, plaintiffs moved to amend the complaint to allege the reasonable value of the saw instead of the value of its use. The trial court did not rule on this motion, but under the particular circumstances of this case we treat the motion as though it had been granted. It was clear throughout the trial that plaintiffs were attempting to recover the value of the saw; Beall allowed evidence of this value to be introduced without objection that it was outside the scope of the pleadings. Beall could not have claimed any unfair surprise upon the assertion of a conversion theory. Its defense was that the saw was purchased with Beall funds, and that the original saw, which it eventually repaired, was the one which should be returned to the partnership. This attempted defense was completely appropriate to the conversion theory, and we do not believe Beall was in any way misled to its prejudice by the allegation in the complaint that the partnership should be reimbursed for the use of the saw rather than

for its full value. The evidence convinces us that there was a conversion and, considering the complaint as amended according to plaintiffs' motion, the conversion was adequately alleged.

11, 12. Finally, we turn to Beall's counterclaim for dismantling and storage charges. The partnership had the right, under the lease, to remove the two pipe mills within 60 days from the end of the lease period. The equipment had not been removed at the time of trial and Beall claimed the right to recover for the value of services it provided in dismantling and preparing the mills for storage, and for the storage itself.. The trial court allowed $3,114.52 for dismantling and preparation, and nothing for storage.

Beall argues that it was entitled to $4,357.09 for preparing the mills for storage and moving them into storage at its plant. It introduced in evidence its internal "cost records" showing charges in this amount. John Beall testified that those charges were reasonable, and that no charge was added to allow for a profit, whereas if anyone else had been hired to do this work a profit figure would have been included in the charge. The difference between Beall's claim and the trial court's award is represented in the "cost records" by a figure called a "burden," calculated as a percentage (135 per cent to 150 per cent) of labor costs. This figure was not explained in the testimony, but, in view of John Beall's uncontradicted testimony that the charges included no profit figure, it seems reasonable to assume that this is a method of allocating overhead.

The measure of restitution for a benefit conferred on another is the value of the benefit to the recipient, not the expense to the party who confers it.

Restatement, Restitution 661, § 155; *Hill v. Waxberg,* 237 F2d 936, 939 (9th Cir 1956); *Herman v. Jackson* (Ky, 1966) 405 SW2d 9, 12; *West v. Peoples First Nat. Bank & Trust Co.,* 378 Pa 275, 106 A2d 427, 433 (1954). In this case the only evidence of the value of these services to the partnership is Mr. Beall's uncontroverted testimony that the total claimed by Beall was a reasonable charge and was, if anything, less than it would have cost to have it done by someone else. Upon this evidence, we find that Beall was entitled to the total charges claimed and that its recovery should not be limited to actual expenditures for labor and materials.

13. As to the storage charges themselves, the trial court held that an obligation to pay Beall for storage of the partnership mills would be implied, but found insufficient evidence from which to determine such charges. Plaintiffs argue that there was no obligation to pay storage charges, but, in view of the partnership's failure to remove the equipment from Beall's plant at the end of the lease, the trial court was clearly correct. *Glaser v. North's et al,* 201 Or 118, 127, 266 P2d 680 (1954); *Roberts v. Gerlinger,* 124 Or 461, 467, 263 P 916 (1928).

Beall called as an expert witness a professional estimator of moving and storage charges for machinery and equipment. This witness testified that a reasonable charge for storage of all the partnership equipment in a commercial warehouse would be between $750 and $850 a month. However, John Beall testified that he once offered to store the partnership equipment for $500 a month, and Beall's comptroller testified that Beall had charged the partnership that rate for storage. The evidence of the expert witness would justify a finding that the reasonable value of the storage was

$750 per month, but we see no reason to allow more than the amount for which John Beall, on behalf of the corporation, offered to store the equipment. We therefore hold that Beall is entitled to recover storage at the rate of $500 per month.

14. The parties disagree about when the storage charges should begin. The evidence shows that a portion of the original partnership mill was still being used by Beall as late as November, 1966. There is no basis in the evidence for calculating a storage charge for part of the equipment only; no amount for storage will be awarded for the period in which Beall was still using this equipment. Moreover, all the leases between the partnership and Beall allowed the partnership 60 days within which to remove the mills from Beall's premises. This is convincing evidence that the parties considered 60 days to be a reasonable time for this purpose. We hold, therefore, that the storage charges should begin February 1, 1967, which is approximately 60 days after Beall's last use of a portion of the partnership's equipment.

The trial court's decree will be modified as follows: The awards to plaintiffs of $27,000 for copying the mill and $8,289.62 for unpaid royalties are eliminated. The award of $10,500 for rental on the through-put mill is reduced to $8,000 plus interest from August 1, 1966. The interest on the award of $20,500 for the conversion of the through-put mill roll will begin August 1, 1966. The offset allowed Beall is increased to $4,357.09 for dismantling and preparing the mills for storage, and storage charges are added in the amount of $8,500, plus interest from January 1, 1969.

As modified in these particulars, the decree is affirmed.