182 N.J. Super. 519 (1982)
442 A.2d 1021
NAOMI WILZIG ET AL., PLAINTIFFS-RESPONDENTS,
v.
SELIG J. SISSELMAN ET AL., DEFENDANTS-APPELLANTS. SELIG J. SISSELMAN ET AL., PLAINTIFFS-APPELLANTS,
v.
ALEXANDER M. GOLDFINGER, JR., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1981.
Decided January 13, 1982.
*521 Before Judges BOTTER, ANTELL and FURMAN.
*522 John J. Degnan argued the cause for appellant Selig J. Sisselman (Shanley & Fisher, attorneys; John J. Francis, Jr. of counsel).
Robert J. Del Tufo argued the cause for appellant Lorraine R. Sisselman (Stryker, Tams & Dill, attorneys).
Murry D. Brochin argued the cause for respondents Wilzig, Donnenberg, Araten, Cohen and Trenk (Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, attorneys; Murry D. Brochin and Marion Percell on the brief).
Gene N. Schiffman argued the cause for respondents Goldfinger and Blumenfeld (Schiffman & Berger, attorneys).
The opinion of the court was delivered by BOTTER, P.J.A.D.
The death of H. Jerome Sisselman (Jerome) on August 20, 1980 created various issues as to its effects, such as the dissolution or continuation and management of certain partnerships in which Jerome had an interest, among which were Bergen County Associates (BCA) and Sisselman Israel Associates (SIA). These two partnerships own the bulk of land in the Berry's Creek Center project, approved by the Hackensack Meadowlands Commission, a massive residential, commercial and recreational development to be constructed on 300 acres of land. The issues were presented in two consolidated actions in which the trial judge entered partial summary judgment determining, among other things, that:
(1) BCA and SIA are partnerships in dissolution;
(2) BCA is reconstituted under the terms of the partnership agreement; its ordinary business is to be governed by majority vote of the partners of such reconstituted partnership and the actions taken by a majority of its partners at the February 13, 1981 meeting which are consistent with the partnership agreement are binding upon the minority partners; and
(3) The Sisselman Trust for the Benefit of H. Jerome Sisselman (the Trust) terminated upon Jerome's death.
Leave to appeal was granted to appellants Selig and his mother Lorraine, who are Jerome's son and widow, to review *523 only these portions of the summary judgment. Although the legal issues can be decided without reference to the particular individuals involved, some background may be helpful in understanding the dispute.
BCA was formed in 1952. The partnership agreement was amended from time to time, the last being by agreement of December 22, 1977. Prior to Jerome's death the partners and their respective interests were as follows: Jerome (8.254%); Jerome's wife Lorraine (8.254%); the Trust (20.06%); Sisselman Trust for the Benefit of Lorraine (20.06%); Jerome's son Selig and Selig's wife Deanna (5.036%); S.J. and D.K. Sisselman Trust (4.0%); Helene Goldfinger and her son Alexander M. Goldfinger, Jr. (25.3%), and Samuel G. Blumenfeld and his wife Florence (9.036%). (The Goldfingers and Blumenfelds are not members of the Sisselman family.) The partnership agreement provided in paragraph 5 that all partners designated and appointed Jerome, Lorraine, Selig, Alexander M. Goldfinger, Jr. and Samuel Blumenfeld as "general managers" and as "managing partners" of the business of BCA, with authority to execute all contracts, deeds, checks and other documents in conducting such business.
SIA was formed on May 4, 1972. The partners and their interests were: Jerome (31%); Selig (35%), and three of Jerome's daughters, Harriet Cohen (11.333%), Rachel Araten (11.333%) and Abigail Trenk (11.333%). Jerome's remaining children, Naomi Wilzig and Sonia Donnenberg, were not included in SIA. SIA's main asset is 180 acres of land in East Rutherford. The partnership agreement named Jerome and Selig as "managing partners" and "general managers" of SIA's business with full authority to act for the partnership.
On June 15, 1951 Lorraine established the Trust mentioned above. (Jerome established a trust for the benefit of Lorraine at the same time.) Jerome was to receive certain income during his lifetime and, upon his death, the remainder was to be divided into six equal parts for the benefit of their six children (their *524 son Selig and five daughters), to be paid directly to such children who had reached age 30 at the time of Jerome's death. Provision was made for the benefit of the surviving issue of any child of the settlor who died before the Trust terminated. All six Sisselman children survived and were more than 30 years of age at Jerome's death. Therefore, they would receive their shares outright if the Trust terminated upon that event. As noted above, the Trust had a 20.06% interest in BCA. In fact, after Jerome's death his daughters took the position that the Trust terminated and they succeeded to their respective portions of the Trust's interest in BCA.
The first issues we will consider pertain to the question of the continuation of the partnerships and the business of BCA and SIA and the management of those businesses. In June 1980, about two months before Jerome died, SIA and BCA executed an agreement with Rose Associates for the joint development of the Berry's Creek Center project. Appellants urge that the vastness of this project, involving property and construction whose value will exceed $1 billion, demonstrates the need for certainty and continuity in the partnership enterprises and their management. They argue that the BCA and SIA agreements should be construed to prevent dissolution of those partnerships notwithstanding the death of Jerome. Alternatively, they contend that even if the partnerships are in dissolution, the managing partners designated in the BCA and SIA partnership agreements should continue as managing partners. As such, they urged the trial court to invalidate action taken by Jerome's daughters and the Blumenfeld and Goldfinger interests in reconstituting the BCA partnership and, as successor partners with aggregate interests exceeding 50% of BCA, in voting to designate Blumenfeld and Goldfinger as the sole managing partners of BCA, stripping Selig and his mother of their previous managerial authority.
The attorneys for Jerome's daughters support the ruling of the trial judge, namely, that BCA is in dissolution, but that a new partnership "was reconstituted" to continue BCA's business, *525 and that the majority vote of the new partners controls. At oral argument their position with respect to SIA was that there is no successor partnership because the successor partners did not reconstitute the partnership. The attorneys for the Goldfingers and Blumenfelds urge that the death of Jerome and, upon the termination of the Trust, the admission of Jerome's daughters into partnership with the surviving partners of BCA caused the dissolution of BCA. They contend that upon Jerome's death the "new and surviving partners" of BCA were obligated to form a reconstituted partnership, the management of which is to be governed by the general provisions of the Uniform Partnership Law as enacted in this State, N.J.S.A. 42:1-1 et seq.
The Uniform Partnership Law establishes general rules governing the rights and duties of partners in relation to the partnership and each other, "subject to any agreement between them." N.J.S.A. 42:1-18. Unless otherwise agreed, all partners "have equal rights in the management and conduct of the partnership business," N.J.S.A. 42:1-18(e); no person can become a partner without the consent of all partners, N.J.S.A. 42:1-18(g), and any difference as to "ordinary matters" of partnership business may be decided by a majority of the partners. But "no act in contravention of any agreement between the partners may be done rightly without the consent of all the partners." N.J.S.A. 42:1-18(h).
Dissolution of a partnership is defined as "the change in the relation of the partners caused by any partner ceasing to be associated in ... carrying on" the partnership business. N.J.S.A. 42:1-29. Dissolution is distinguished from termination of the partnership business; despite dissolution, the partnership continues for the purpose of winding up partnership affairs. N.J.S.A. 42:1-30; Scaglione v. St. Paul-Mercury Indem. Co., 28 N.J. 88, 102 (1958). Generally, therefore, dissolution affects future transactions, but as to all past transactions the partnership continues until they are concluded. Id. Thus, subject to *526 the prior payment of his separate debts, the property of a deceased partner is liable for all obligations of the partnership incurred while he was a partner. N.J.S.A. 42:1-36(4).
The causes of dissolution are established by N.J.S.A. 42:1-31.[1]N.J.S.A. 42:1-32 also provides for dissolution by court order for various reasons, including such circumstances as insanity or willful breach of the partnership agreement which prevent a partner from performing his role in the partnership. Analysis of § 31 strongly suggests that dissolution occurs automatically upon the death of any partner, N.J.S.A. 42:1-31(4), or by the express will of a partner at any time, even in contravention of the partnership agreement, N.J.S.A. 42:1-31(2) (subject to damages for breach of the agreement, N.J.S.A. 42:1-38(2)(a)(II)).[2] *527 This is contrasted with subsection 1 of § 31 which provides for dissolution in certain circumstances if not in violation of the agreement. In other words, the statute deems the death of a partner cause for dissolution without regard for the terms of the partnership agreement.
However, it is necessary to distinguish between the legal status of dissolution, with the consequent fixing of liability for past transactions, and liquidation or continuation of the partnership business by surviving partners, with or without the addition of a new partner or partners or the substitution for a departing partner. The causes for dissolution in § 31, such as the death or withdrawal of a partner, do not preclude the remaining partners from carrying on the business pursuant to a prior agreement, with or without the addition of new partners. The Uniform Partnership Law expressly contemplates the continuation of partnership business without liquidation by the partnership formed by the admission of a new partner or partners or simply by the elimination of an old partner or partners through death, retirement, expulsion, withdrawal or assignment of rights in partnership property. N.J.S.A. 42:1-41. Section 41 generally provides that "without liquidation" creditors of the "dissolved partnership are also creditors of the person or partnership continuing the business."
A number of states have modified their statutes to provide that the death of a partner causes dissolution unless the agreement between the partners provides otherwise. Ala. Code, Tit. 7, § 10-8-91(4); Iowa Code Ann. § 544.31(4) (West Supp. 1981); Kan. Stat. Ann. § 56-331(d); Miss. Code Ann. § 79-12-61(4) (Harrison Supp. 1981); N.C. Gen. Stat. § 59-61(4); Okla. Stat. Ann., Tit. 54, § 231(4) (West); Tex. Rev. Civ. Stat.Ann., Art. 6132b § 31(4). The annotation to the Texas statute, supra, shows that § 31(4) of the national uniform law "states the *528 common law rule that a partnership is dissolved by the death of any partner." It states that the purposes of the amendment were the avoidance of tax problems and loss of going concern value through untimely dissolution. See, also, Crane and Bromberg, Law of Partnership, § 73 at 418-419 (1968), discussing the need for continuation of large partnerships such as present day accounting, law and investment firms with hundreds of partners and frequent changes in membership. However, nothing in the Uniform Partnership Law prohibits enforcement of an agreement requiring the continuation of the partnership business without liquidation by the remaining partners with or without participation of the legal representative of a deceased partner or the substitution of the person acquiring his interest. This was the law in New Jersey prior to the adoption of N.J.S.A. 42:1-1 et seq. In Wild v. Davenport, 48 N.J.L. 129 (E. & A. 1886), the court held that the executors of a deceased partner who did not participate in managing partnership affairs were not personally liable for debts contracted by the firm after the death of the testator. In the course of the opinion, the court said:
... As a general rule the death of one partner works a dissolution of the partnership. If an executor engages in business, either as a sole trader or in a partnership, with the testator's assets, though he does it as executor, and not for his individual benefit, he will be personally liable for the debts incurred in the business, and this although he does so in compliance with directions in the testator's will, or in conformity with articles of partnership to which the testator was a party which provide, as articles of partnership sometimes provide, that on the death of a partner his executor or personal representatives shall be admitted into the firm. [Citations omitted.]
A provision in articles of partnership that on the death of a partner his executor or personal representative, or some other person, shall be entitled to the place of a deceased partner in the firm, with the capital of the deceased in the firm business, or some part of it, is binding upon the surviving partner to admit the executor, personal representative or nominee of the deceased partner, but does not bind the latter to come in. They have an option to come in or not, and a reasonable time within which to elect. [Citations omitted.] An executor or nominee of a deceased partner coming in under such a provision in partnership articles comes in as a partner, with all the rights and liabilities of a partner, and consequently becomes personally liable for debts contracted in the business. He is made personally liable for debts for the reason that he has of his own volition engaged in the business as a principal, and is a contracting party....

*529 On the other hand, a stipulation in partnership articles, that upon the death of a partner his capital shall remain in the business until the expiration of the prescribed term of the partnership, is binding as well upon the estate of the deceased as upon the surviving partner. [Citations omitted.] Where the provision in the partnership article is simply that the deceased partner's capital shall remain in the business, the executor is not admitted into the management of the business. The control of the business is with the surviving partner. The executor cannot withdraw the capital of the deceased partner without subjecting the estate to liability to suit, nor can he exercise the control of a partner in the conduct of the business. In this situation none of the reasons for the liability of a partner exist as against him. Hence it is that when by the articles of partnership a new member is brought into the firm on the death of a partner, as an executor or trustee, firm creditors becoming such after the partner's death have the personal liability of the admitted member of the firm; but where by the articles the capital only of the deceased partner is continued in the firm without any person being added, such creditors have only the liability of the surviving partner, by whom the business is carried on, and the security of that part of the estate of the deceased partner which is left in the business.
Thus, in Wild v. Davenport the court recognized the validity of agreements calling for continuation of the partnership business by surviving partners, with or without participation of a new partner. See Adams v. Jarvis, 23 Wis.2d 453, 127 N.W.2d 400 (Sup.Ct. 1964), in which the court held that an agreement for continuing the partnership by the remaining partners would be enforced as "in effect a type of winding up of the partnership without the necessity of discontinuing the day-to-day business." 23 Wis.2d at 459, 127 N.W.2d at 403. The court said that, "while withdrawal of a partner works a dissolution of the partnership under the statute as to the withdrawing partner," the partnership would continue to exist as to the remaining partners. Id. Similar views were expressed in McClennen v. Internal Revenue Comm'r, 131 F.2d 165 (1 Cir.1942), where the court said that, absent a controlling agreement, the death of a partner dissolves the partnership and requires a winding up, completion of all outstanding transactions and liquidation of assets. The court went on to state that, by agreement, liquidation could be postponed (with the same result as was reached in Wild v. Davenport, supra), and by the agreement before that, court liquidation could be avoided entirely by payment to the deceased partner's estate of a sum specified in the agreement (a share in the firm's *530 net profits for a given period of time). Thus, the interest of the deceased partner is extinguished and the remaining partners succeed to all the partnership assets subject to the obligation to decedent's estate as provided in the agreement. Similarly, N.J.S.A. 42:1-42 provides for the valuation and payment of the partnership interest of a partner who has retired or died, subject to the agreement of the parties ("unless otherwise agreed"). Sorokach v. Trusewich, 13 N.J. 363, 368 (1953).
We will now consider the provisions of the BCA and SIA partnership agreements with respect to dissolution and liquidation or continuation of the business of the partnerships. As noted above, the trial judge held that BCA was dissolved by the death of Jerome and that the partnership was reconstituted by old and new members (the daughters becoming partners by taking their respective shares of the terminated Trust). We concur with these conclusions. The trial judge also held that the action of the majority of partners at the February 13, 1981 meeting designating Blumenfeld and Goldfinger managing partners of the new partnership was valid and effective. We will consider the question of the management of BCA and SIA later in this opinion. As a practical matter this is the essential dispute between the parties. The positions they have taken on the abstract aspects of dissolution merely reflect their desires to obtain managerial control of the partnerships.
The clear intent of the BCA partnership agreement is to provide for the continuation of the partnership business in case of "dissolution" due to the death or withdrawal of any partner. We note, incidentally, that BCA's business included the ownership and management of an industrial park as well as ownership of vacant land slated for inclusion in the Berry's Creek Center development.
Paragraph 2 of the December 22, 1977 agreement provides that the parties associate together as a firm in substitution for the partners named in the May 1, 1952 partnership agreement, to continue as a partnership "until dissolved as hereinafter *531 stated." As noted above, three separate trusts participated as partners in BCA. Paragraph 8 provided that upon termination of any such trust the "beneficiaries of said trust shall be considered as a co-partner" to the extent of the interest held by the trust "unless such ... beneficiaries shall elect by written notice ... to withdraw from the co-partnership," in which case the withdrawing beneficiary would have the rights provided by the agreement for a withdrawing partner. This provision contemplates the automatic substitution of beneficiaries of a terminated trust for the partnership interest of the trust in BCA, as if no dissolution is caused by that substitution. A similar provision is contained in paragraph 11 with respect to the termination of a testamentary trust established by any partner. Only in paragraph 10 is there an express provision that the partnership "shall not dissolve" in the event a partner sells or gives to any other partner all or part of his partnership interest.
The principal paragraph affecting the issues before us is paragraph 9. It provides for distribution of assets, "In the event this co-partnership shall be dissolved by the death or the voluntary withdrawal by any partner...." It goes on to provide:
If this co-partnership be dissolved by the death of any partner, the surviving spouse of such deceased partner, if legally entitled to do so, may join the partnership in the place and stead of the deceased partner, being entitled to all of the emoluments and subject to all the liabilities and obligations which the deceased partner was subject and entitled to.
In case the surviving spouse of a deceased partner is not legally entitled to substitute as a partner or elects not to do so, paragraph 9 provides for payment for the full value of the deceased partner's interest over a ten-year period. Paragraph 9 further provides: "If this co-partnership be dissolved by the withdrawal of any partner," the withdrawing partner will receive only 75% of the appraised value of his or her partnership share. Finally, paragraph 9 provides:
In the event of the dissolution of the partnership for either of the reasons above stated, the surviving partners agree to form a new co-partnership[,] each of such remaining partners to pay to the deceased partner's heirs or representative *532 or to a withdrawing partner such sums as are hereinabove set forth in the proportions to which the remaining partners own interest in the original co-partnership, so that after the payment of such deceased or withdrawing partner's share the remaining partners will continue to own interests in the new co-partnership in the same proportions to each other as they owned interests in the original partnership.
Thus, the agreement looks toward the substitution of the spouse of a deceased partner in the partner's place, but the author of the agreement had an unclear vision of the enforceability of that provision. The agreement contemplates that the death or withdrawal of a partner would cause the dissolution of the partnership. An express provision against dissolution exists only as to a gift or sale of an interest to a copartner, in which case the agreement sought to prevent dissolution, even if all of a partner's interest is so transferred.
The agreement clearly intends that a surviving spouse should be allowed to join the partnership in place of a deceased partner, unless the spouse elects not to do so. Lorraine made no such election. She had been a partner in the old BCA but did not attend the February 13, 1981 meeting. We construe the agreement to obligate the remaining partners to join in a new partnership with Lorraine and the beneficiaries of the terminated Trust, to continue the business of BCA. The parties agree that the continuation of BCA's business was intended, but appellants want to treat BCA as not dissolved by the departure of Jerome and the substitution of his wife and beneficiaries of the Trust. Appellant's purpose is to apply the management clause in the 1977 BCA agreement to the continuing enterprise. Apart from the management issue we think it clear that the newly composed BCA partnership must continue the former business of BCA without liquidation, taking the assets and accepting the liabilities as they were before Jerome's death. Since the personal relationship of the partners is the essence of a partnership,[3] the addition of new members and the departure of Jerome constituted a dissolution of the old BCA and the composition *533 of a successor BCA partnership. N.J.S.A. 42:1-29. The successor partnership was organized at the February 13, 1981 meeting. Any party not agreeing to continue in the business would have become a withdrawing partner, penalized in the amount he or she would receive in payment for his or her partnership interest, unless all withdrew at the same time. In this case the formation of the new partnership and assumption of liabilities of the old BCA constituted the automatic winding up of the affairs of its predecessor. Adams v. Jarvis, supra, 23 Wis.2d at 459, 127 N.W.2d at 403. Thus, the business would continue without interruption. The question of management remains.
The SIA agreement also looks toward the continuation of the business despite the death or withdrawal of a partner. It provides that a partner's interest is not assignable, but a person who inherits a partner's interest "shall succeed to the rights of the deceased Partner as a substituted Partner." It requires the remaining partners to purchase the share of a withdrawing partner on terms fixed by the agreement. In our opinion it requires the surviving partners to continue the business or to sell out his or her interest to any surviving or substituted partner who does not elect to withdraw. It also contains provisions for the management of partnership business. It is not clear whether any partner in SIA has elected not to continue in the partnership to be formed by the substituted and surviving partners and, therefore, should be treated as a withdrawing partner. Apparently no formal action has been taken to organize the successor SIA partnership, and SIA has not been wound up or liquidated. The declaration in the summary judgment that SIA is "in dissolution" does not conclude the matter.
Thus, we come to the critical issue: management and control. On this subject the BCA agreement provides:
5. It is further understood and agreed that all co-partners hereby designate and appoint H. Jerome Sisselman, Selig J. Sisselman, Lorraine R. Sisselman, Alexander M. Goldfinger Jr. and Samuel G. Blumenfeld as general managers of the business and affairs of the partnership and hereby designate them as *534 managing partners specifically authorizing the above named to execute and deliver any and all papers, documents, deeds, checks, notes, contracts or any legal document deemed necessary or desirable to carry on the business of the partnership.
There is no express provision in the BCA agreement dealing with management in the event a managing partner dies or becomes incompetent to act. By contrast the SIA agreement appoints Jerome and Selig "as general managers," and in case either dies or becomes disabled Martin L. Sisselman is named as the successor. Although Martin Sisselman is not a partner and cannot be a "managing partner," this problem in semantics does not prevent enforcement of the management provisions. Partners can hire a nonpartner to manage a business. The scope of managerial authority is not before us.
Obviously, the provisions for continuation of the partnerships would be meaningless if the new partners were not bound by the terms of the underlying agreements. Provisions for succession, withdrawal, payment for partnership interests and the like must be deemed binding upon the partners, their heirs and assigns. The management provisions of the SIA agreement leave no doubt as to the "general managers" of the successor partnership: Selig and Martin Sisselman. We need not concern ourselves with the legality of each successor appointing a substitute person or corporation in his place in perpetuity. That event has not yet occurred.
The question of management of BCA is more troublesome. Absent a clear provision limiting the management authority of partners in the successor partnership, we conclude that the provisions of our Uniform Partnership Law, N.J.S.A. 42:1-1 et seq., control. We reach this result for a number of reasons. First, the BCA agreement provides for succession and substitution in a number of instances, but the clause on managerial authority is silent on the subject. Although the addition of new partners in some instances was not intended to dissolve the old partnership, the agreement generally views the withdrawal of a partner as cause for dissolution that requires the formation *535 of a successor partnership. Moreover, because our partnership law requires unanimous agreement of all partners, on all but "ordinary matters," N.J.S.A. 42:1-18(h), the right of a partner to be heard on fundamental and vital aspects of the partnership enterprise, matters that could substantially affect the investment and liability of a partner, should not be deemed surrendered unless the intention to do so is clearly expressed. Management rights are extremely important since partners are generally liable jointly for all obligations arising from the conduct of partnership business. N.J.S.A. 42:1-15. See, also, N.J.S.A. 42:1-17 as to the liability of a person coming into an existing partnership for preexisting obligations to the extent of partnership assets.
Appellants would have us interpret the provision for management of BCA under the 1977 agreement to say that the surviving partners named as managers continue as exclusive managers under a successor partnership. That could result in only one named manager surviving after a period of years although there could be numerous substitutions for deceased or withdrawn partners. Giving one surviving partner exclusive management rights is unlikely to reflect the intentions of the parties. In addition, the managing authority in BCA was shared by members of the Sisselman family with nonmembers, Goldfinger and Blumenfeld. The nonmembers held substantial interests in BCA, collectively amounting to 34.336%. In the absence of a clear mandate, we could not infer an intention to turn management over exclusively to the survivors of those named when that interpretation could result in an imbalance in representation of partnership factions. The right to participate in management is a fundamental partnership right; it is deemed part of a partner's "property" rights. N.J.S.A. 42:1-24(3). Partners can cede managerial control of its business to one or more partners. Parks v. Riverside Ins. Co. of America, 308 F.2d 175, 180 (10 Cir.1962); Elle v. Babbitt, 259 Or. 590, 488 P.2d 440, 446 (Sup.Ct. 1971). But management rights ought not be taken away by an intention discerned through guesswork.
*536 Thus, we conclude, the new BCA partnership should be managed according to the provisions of N.J.S.A. 42:1-18(h). That section does not contemplate the delegation of managerial authority over partnership business except as to "ordinary matters." See, also, N.J.S.A. 42:1-9 which makes every partner the agent of the partnership for the purpose of conducting its business in its apparently "usual way," but subsection 3 limits the authority of partners in a going business to do certain things vitally affecting the ability to conduct that business unless authorized by all other partners.
The extent of the authority given to Goldfinger and Blumenfeld as managing partners at the February 13, 1981 organization meeting was not fully explored below. The record reflects a dispute concerning the contractual arrangements for developing the Berry's Creek Center project. The complaint in the action brought against Selig charges him with self-dealing, to the disadvantage of the partnership, by an arrangement that could provide him with fees and commissions totaling $3.7 million. Whether essential agreements with Rose Associates have been finalized and are binding on the successor BCA partnership and whether such contracts, if lawfully entered into and binding, can be avoided or modified by the new BCA are potential issues not yet presented to the trial court. But the question of the extent of managerial control that can be delegated to less than all partners by less than all partners may be implicated in the fundamental differences between the parties.
The majority vote garnered at the BCA reorganization meeting depended upon the exercise of voting power by Jerome's daughters as successors of 5/6ths of the Trust's interest in BCA. If the Trust terminated we see no reason why Jerome's surviving children should not immediately succeed to those interests so as to exercise partnership rights, even if conveyance of the land and an accounting have not been consummated. The surviving children have beneficial title to the land even if legal title has remained in the trustees. The trustees of the Trust, *537 Lorraine and Selig, could no longer fairly exercise their fiduciary obligations to Jerome's daughters with respect to the Trust's interest in BCA since they were in actual as well as potential conflict with those beneficiaries. The only question which concerns us is the holding below that the Trust terminated upon Jerome's death. As stated above, we concur in that conclusion.
The Trust was established by a trust agreement between Lorraine and its trustees, Jerome and Lorraine. It provided in part:
5. This Agreement and the Trust herein set up is irrevocable and may not be changed or modified by the parties hereto.
Notwithstanding this provision, an attempt was made to extend the life of the trust beyond the date Jerome died, in conflict with the trust provision that the shares of each surviving child who has reached 30 years of age shall be paid over and delivered to such child "outright and absolutely," and the Trust "shall terminate" as to such child. This attempt was by an agreement dated December 15, 1977 which was signed by all of Jerome's children except one. Naomi Wilzig did not sign. The document read as follows (emphasis ours):
AGREEMENT
WE the undersigned,

Being all the beneficiaries named in a certain Trust Indenture dated June 15, 1951, and known as the LORRAINE R. SISSELMAN TRUST for the benefit of H. JEROME SISSELMAN, et als.,

Do hereby agree as follows:
(1) THAT the Trust be extended to December 31, 1982.
(2) THAT all terms and conditions as set forth in said Trust shall remain in full force and effect until December 31, 1982.
Below these provisions were lines with the names of Jerome's six children, showing that it was expected that all would sign this "agreement." Despite the fact that the document was dated in December 1977 and Jerome did not die until August 1980, the agreement was never completed by Naomi's execution or delivery of the document. She not only refused to sign the agreement but she kept all six duplicate original copies that had *538 been sent to her. Two of her sisters who did sign assert that they did so on the assumption that all would sign the agreement. The record shows that Naomi and her sister Sonia had not signed an earlier document, dated December 22, 1967, which attempted to terminate the Trust. That document had been signed by Lorraine, the settlor, by Jerome, the life tenant, and by the four other children, but was obviously regarded as incomplete and ineffective without the consent of all contingent remaindermen. Thus, all the evidence submitted below shows an intention that all were to sign the trust extension agreement for it to become effective. There was no factual dispute requiring a hearing.
The attempt to extend the Trust to December 31, 1982 suggests an expectation that Jerome would die before then. If Jerome lived beyond 1982, the Trust should have continued. Actually, it is not clear whether the agreement was intended to provide for extension despite Jerome's earlier death, if it occurred, and, as well, to terminate the Trust on December 31, 1982 in any event. Assuming that it was possible to modify the Trust's termination date notwithstanding the clause precluding modification and without frustrating the intent of the settlor (whose attorneys now urge the effectiveness of the agreement as to those children who signed), no extension could have bound any beneficiary who did not consent if the nonconsenting beneficiaries would be prejudiced by the modification. See 2 Restatement, Trusts 2d, §§ 337 and 338 at 158, 167 (1959). Clearly, the postponement of distribution by extending the termination date could have prejudiced any remainder beneficiary by delaying enjoyment of the corpus and by withdrawing control over the corpus if the beneficiary's death preceded termination. Similarly, one of Jerome's grandchildren might have been prejudiced by the extension. The trust indenture provided that the surviving issue of a child who predeceased Jerome would take that child's share on Jerome's death, but if no such issue survived Jerome the deceased child's share would go to his or her surviving brother (Selig) and sisters. One of Jerome's children could have *539 predeceased Jerome, and on Jerome's death that deceased child's surviving issue would take a one-sixth share. However, the extension agreement would have extended the Trust's termination date to December 31, 1982. Any surviving issue of Jerome's predeceased child would have had to survive until December 31, 1982 in order to take his or her share although Jerome might have died after his child's death but before the Trust termination date. Thus, a grandchild who died before December 31, 1982 could lose a share of the Trust that he or she might have obtained upon Jerome's death before that date. Since the extension agreement was not signed by or on behalf of these remote contingent remainder beneficiaries, the agreement did not become effective.
For all the foregoing reasons, we reject appellants' contention that the agreement effectively continued the Trust as to those beneficiaries who signed, even though it was ineffective as to those who did not sign. A postponement of enjoyment of partnership rights in BCA by some of Jerome's daughters could have shifted the majority vote. Appellants' purpose is to continue to exercise rights as trustees as to the interests of those who signed the extension agreement although the interests of those beneficiaries conflict with appellants' interests. The result we reach avoids this conflict but is not reached because of the conflict.
We have not attempted to delineate the full scope of authority that can be delegated to the "general managers" of BCA's business by less than unanimous vote. The record does not disclose the extent to which authority to make management decisions was given to Goldfinger and Blumenfeld at the February 13, 1981 meeting. Nor have we been asked to pass on the validity of other action taken at that meeting, except as to the dissolution of BCA and the reorganization of its successor partnership. With this caveat and the qualifications expressed as to the significance of the holding that BCA and SIA are in dissolution, we affirm the summary judgment. The case is remanded *540 to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] N.J.S.A. 42:1-31 provides as follows:

Dissolution is caused:
1. Without violation of the agreement between the partners,
a. By the termination of the definite term or particular undertaking specified in the agreement;
b. By the express will of any partner when no definite term or particular undertaking is specified;
c. By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking;
d. By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners;
2. In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time;
3. By any event which makes it unlawful for the business of the partnership to be carried on or for the members to carry it on in partnership;
4. By the death of any partner;
5. By the bankruptcy of any partner or the partnership;
6. By a judgment of court under section 42:1-32 of this Title.
[2] The Official Comment to § 31, Uniform Partnership Act, 6 U.L.A. at 377 (1969), states in part: "The relation of partners is one of agency. The agency is such a personal one that equity cannot enforce it even where the agreement provides that the partnership shall continue for a definite time." It confirms that any partner can terminate the relationship even in breach of contract, subject to rights given by § 38(2).
[3] See note 2, above.