259 N.J. Super. 59 (1992)
611 A.2d 158
STATEWIDE REALTY COMPANY, A NEW JERSEY GENERAL PARTNERSHIP, JACK POMERANC, FRANK BLAICHMAN, JACOB BURSTYN, MONROE MARKOVITZ AND JESSE S. WEISSBERG, PLAINTIFFS,
v.
FIDELITY MANAGEMENT AND RESEARCH COMPANY, INC., A MASSACHUSETTS CORPORATION, FOR AND ON BEHALF OF ITSELF AND THE SEVERAL FIDELITY TAX-EXEMPT BOND FUNDS WHICH HOLD THE STATEWIDE BONDS, FIDELITY AGGRESSIVE TAX-FREE, PORTFOLIO, A MASSACHUSETTS BUSINESS TRUST, FIDELITY HIGH-YIELD TAX-FREE PORTFOLIO, A MASSACHUSETTS BUSINESS TRUST, NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY, A PUBLIC BODY CORPORATE AND POLITIC CONSTITUTING AN INSTRUMENTALITY OF THE STATE OF NEW JERSEY AND UNITED JERSEY BANK, A BANKING INSTITUTION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
May 11, 1992.
*61 Michael R. Griffinger and John T. Wolak, for Plaintiffs STATEWIDE REALTY COMPANY, a New Jersey General Partnership, JACK POMERANC, FRANK BLAICHMAN, JACOB BURSTYN, MONROE MARKOVITZ and JESSE S. WEISSBERG (Crummy, Del Deo, Dolan, Griffinger & Vecchione attorneys).
Bruce F. Metge and Kevin M. McGinty (Mintz, Levin, Cohn, Ferris, Glovsky & Popeo attorneys) and Joanne G. Eyler (Budd Larner Gross Rosenbaum Greenberg and Sade attorneys) for Defendants Fidelity Aggressive Tax-Free Portfolio and Fidelity High-Yield Tax-Free Portfolio.
ALLEY, J.S.C.
A. Findings of Fact
This case arises from the development and financing of the Vista Hotel near Newark International Airport. The hotel, which is operated by Hilton International under a management agreement, was constructed in the late 1980's after permanent financing had been arranged through an issue of $31,000,000 in *62 unrated bonds of the New Jersey Economic Development Authority ("NJEDA" or "Authority") on December 30, 1985.
At the time of the 1985 bond issue, the developer was a New Jersey general partnership named Statewide Realty Company, referred to in the Loan Agreement and other documents pertaining to the bond issue as the "Borrower" (and referred to below as "Statewide" or the "Borrower"). The general partners of the Borrower when the bonds were issued were five individuals, Jack Pomeranc, Frank Blaichman, Monroe Markovitz, Jacob Burstyn, and Jesse S. Weissberg (sometimes referred to below as the "Individual General Partners"). These individuals and Statewide are the plaintiffs.
The bonds issued by the NJEDA in connection with the December 1985 closing were immediately purchased from the underwriter by two tax-exempt mutual funds managed by the Boston-based Fidelity Management and Research Co. ("Fidelity"). The proceeds of the bond sale to Fidelity were used to fund the NJEDA's Loan to Statewide, and Fidelity continues to hold the bonds in those tax-exempt mutual funds.
The December 1985 Loan Agreement for the bond issue, which was entered into between the NJEDA and Statewide, expressly defines the "Borrower" as
"(i) Statewide ..., a general partnership consisting of ... [the named Individual General Partners], general partners, organized and existing under the laws of the State of New Jersey and (ii) its successors and assigns as provided in Section 7.15 hereof." (Section 1.1).
The Loan Agreement provided for a "loan in the amount of $31,000,000 made hereunder by the ... [NJEDA], as lender, from the proceeds of the issuance of the initial Bonds to the Borrower, as debtor, to provide for part of the cost" relating to the "construction of an airport hotel [on property of Statewide] of approximately 375 rooms, together with the purchase of machinery, equipment, and furnishings to be used in connection therewith, located adjacent to Newark International Airport."
Of the numerous obligations set forth in the Loan Agreement, this decision focuses on the agreement of the "Borrower" *63 (i.e., Statewide, comprised of the five Individual General Partners), to pay the principal and interest on the $31,000,000 loan. Under the bond issue closing documents, the Borrower's payments are to be in an amount sufficient to pay the principal and interest on the bonds.
The Borrower was represented by various advisors who negotiated the transaction on its behalf. Before the closing, it received from advisors a revenue and expense estimate which projected a positive cash flow to the Borrower after an initial start-up period. When the hotel opened, however, whether due to a downturn in the economy or other factors, plaintiffs found the reality far less rosy than the projections.
Faced with continuing losses rather than profits from the hotel, and faced with the Borrower's liability to pay principal and interest on the $31,000,000 Loan from the NJEDA, the Individual General Partners entered into a transaction as of February 28, 1991, in which they transferred their respective general partnership interests in the Borrower to other entities pursuant to an "Assignment and Assumption Agreement."[1] A number of professed purposes for the transfer were set forth in the Assignment and Assumption Agreement and were testified to on behalf of Statewide at the trial, including limiting or avoiding liability of the Individual General Partners for personal injuries at the hotel or in environmental matters. As plaintiffs admitted at trial, the transfer was also designed to enable the Individual General Partners to avoid whatever personal liability they might have as Statewide's general partners for the $31,000,000 Loan under the Loan Agreement.
When Fidelity learned of the February 1991 transfer of the individual partnership interests in Statewide, it asserted that no such transfer would relieve the partners of what Fidelity contends *64 is their continuing personal liability, as general partners of Statewide, for repayment of the principal and interest of the $31,000,000 Loan under the Loan Agreement. Plaintiffs then agreed to postpone the effective date of the transfer to January 18, 1992.[2]
Statewide and the persons who were its general partners as of the making of the Loan Agreement filed their complaint in this action on September 3, 1991. Named as defendants were the NJEDA, Fidelity, and United Jersey Bank ("UJB") as successor Trustee under the Trust Indenture for the bond issue. On April 20 and 21, 1992, the case proceeded to trial by the court without a jury on plaintiff's request that the court:
(a) Declare that the transfers heretofore made by the general partners of Statewide of their respective partnership interests in Statewide, and any other transfers they wish to make, be deemed permissible and proper transfers as of January 18, 1992 or thereafter.[3]
(b) Declare that as of the date of such transfer, assignment or divestiture of a partnership interest in Statewide, the partner so transferring, assigning or divesting his interest shall be discharged from all liability under the Loan Agreement, and such liability shall be the liability of the transferee or assignee of the interest."[4]
Pursuant to Rule 1:7-4, in addition to the foregoing facts, the court also makes the following findings of fact.
Under the Promissory Note and the Loan Agreement, Statewide obligated itself to make semiannual interest payments and *65 annual principal payments every year from 1986 through 2017. The successor Statewide partnership formed by the Individual General Partners' transfers has the same name and the same assets as Statewide, and the new transferee corporations (the "Holding Corporations") all have the same partnership interests and liabilities as did the Individual General Partners, who through the Holding Corporations retain all of their financial interest in the Vista Hotel.
As noted, the motivation for the Individual General Partners' transfer to the Holding Corporations included their desire to avoid all forms of personal liability relating to the Vista Hotel, including personal liability under the Loan Agreement. They received no consideration for the transfers, and the Holding Corporations have no capital, no bank accounts, and no assets other than the general partnership interests which the Individual General Partners attempted to convey.
Section 10.7 of the Loan Agreement is an integration clause under which the Loan Agreement supersedes all prior agreements, and Section 10.2 requires all amendments to be in writing and signed by the "party against whom enforcement ... is sought." No relevant written amendments were shown to have been made or approved by Fidelity, by the Trustee, or by the NJEDA.
Indeed, there was no persuasive showing that Fidelity, the NJEDA, UJB, or their agents, agreed to allow, or engaged in a course of dealing that allowed, any of the Individual General Partners to be discharged from their liability after January 18, 1992. On the contrary, at the time of the attempted transfers, the Individual General Partners did not seek the agreement of Fidelity, the NJEDA, or UJB. Upon hearing of the transfers, the NJEDA reserved its approval of the transaction subject to additional documentation from Statewide, which was never sent to the NJEDA. The Assumption Agreement, by which the Individual General Partners attempted to accomplish the transfers, does not refer to Section 7.19 of the Loan Agreement. *66 Furthermore, it does not contain the signature of Fidelity as a partnership creditor assenting to the transfer or to a discharge of partnership liability, nor does it recite any agreement of Fidelity to relieve the Individual General Partners of their personal liability.[5] The Individual General Partners attempted unsuccessfully to renegotiate documents relating to the Loan, as is shown by a December 12, 1988, memo from their lawyer to their financial consultant mentioning a need to find a justification to avoid posting a $3.6 million Start-up Letter of Credit required under the Loan Agreement.
The Individual General Partners at the time of the bond issue were highly experienced real estate developers, familiar with large transactions, and upon becoming general partners in Statewide, they were aware and warranted to each other that they were:
... knowledgeable in real estate transactions, sophisticated with respect to financing and in particular, this project, and have had the opportunity to consult with counsel of their choosing.
They also were aware and warranted to each other that they understood that they might be required to individually guarantee the Loan. Justice is not meted out according to the wealth or poverty of litigants, but it is probative of the Individual General Partners' sophistication that as of 1984 they claimed a combined net worth of over $185,000,000.
Fidelity knew before the bond issue closing that at least some of the Individual General Partners would not sign personal *67 guarantees as to Statewide's obligations under the Loan Agreement, and no such guarantees were listed as security for Statewide's obligations in the closing papers. This does not, however, mitigate their personal liability as general partners, particularly in view of their trial admission that they retained that liability at least up to the time of the transfer of their interests.
The Individual General Partners were aware that they could negotiate to limit their personal liability for partnership obligations, for they did so successfully in Statewide's contract with Hilton International, the hotel's management company, executed approximately one year before the bond issue. During the negotiations between the parties in 1985, however, the Individual General Partners and their representatives never discussed with Fidelity or the other parties to the transaction any limitation on their personal liability as general partners in Statewide, and as noted, they admit that they were personally liable from at least 1989 through January 1992 on the Permanent Loan. Indeed, they made personal payments on the Loan's debt service from 1989 through 1991. There is no evidence that these experienced and very substantial investors did not receive competent counsel.
It is undisputed that Mr. Pomeranc signed the Loan Agreement and other closing documents for Statewide, and there is no merit to any claim that Fidelity should be equitably estopped from asserting the personal liability of the general partners of Statewide. Plaintiffs appear now to contend that Fidelity made an inaccurate representation or engaged in a misleading failure to speak concerning the general partners' personal liability. That forms no basis for relief, however, because the Individual General Partners did not rely on any such alleged statement or misleading failure to speak, assuming for the sake of argument that all the elements of equitable estoppel other than reliance had been proved. Furthermore, they understood prior to the execution of the Loan Agreement and Note that they would be personally liable as general partners of Statewide, and the *68 evidence to the contrary is utterly unconvincing. Mr. Pomeranc did not read the documents he signed for Statewide, but as will be shown below, that factor cannot be accorded any weight as a defense to the agreements that he knew he was signing in this complex and very formal transaction. Mr. Pomeranc testified that his formal education ended after four years of schooling in his native Poland, but during his testimony the Court observed him to be astute and alert and an able speaker of English.

B. Conclusions of Law

It is fundamental that a contract must be enforced in accordance with the express written terms of the contract itself, which evidences the parties' intention and agreement. Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 582, 518 A.2d 223 (1986); Karl's Sales & Service, Inc. v. Gimbel Bros., 249 N.J. Super. 487, 492, 592 A.2d 647 (App.Div. 1991); Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 148, 165 A.2d 543 (App.Div. 1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1961). Presented with a contract whose terms are clear and unambiguous, the court must enforce the terms as written, Karl's Sales & Service, supra, 249 N.J. Super. at 493, 592 A.2d 647, and extrinsic evidence outside the agreement may not be considered. See, Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 27, 493 A.2d 1261 (App.Div. 1985). This is a rule of substantive law and not merely one of evidence. See, Downs v. Jersey Central Power & Light Co., 117 N.J. Eq. 138, 139, 174 A. 887 (E. & A. 1934).
In New Jersey, general partners are jointly liable for all debts and non-tort liabilities of the partnership. N.J.S.A. 42:1-15 (1991). Dissolution of the partnership does not terminate that liability, N.J.S.A. 42:1-36(1), and must be "distinguished from termination of the partnership business; despite dissolution the partnership continues for the purpose of winding up partnership affairs." Wilzig v. Sisselman, 182 N.J. Super. 519, *69 525, 442 A.2d 1021 (App.Div. 1982). Dissolution can cut off a partner's liability for future acts of the partnership but leave undisturbed liabilities the partnership has incurred prior to dissolution. See, Scaglione v. St. Paul-Mercury Indemnity Co., 28 N.J. 88, 102, 145 A.2d 297 (1958).
Under New Jersey law, a partner in a dissolved New Jersey general partnership can be discharged from liability for existing partnership obligations only by a tripartite accord, namely, "an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business." N.J.S.A. 42:1-36(2). The agreement, under the statute, may be express or arise from a course of dealing.
There has been no express agreement under N.J.S.A. 42:1-36(2) among the Individual General Partners, the partnership creditor, and the person or partnership continuing the business, to discharge those partners from liability, nor has there been a course of dealing by anyone that allows any of the Individual General Partners to be thus discharged. Plaintiffs argue in effect that Section 7.19 of the Loan Agreement was an agreement at the time of the bond transaction years ago to give the Individual General Partners an option to discharge themselves from personal liability while retaining their interest in the Vista Hotel, but that contention is fundamentally unsupported by the evidence. Section 7.19 does not, either on its face or on the basis of extrinsic evidence, provide for any limitation or termination of the Individual General Partners' liability. It is a negative covenant, not an undertaking or consent to release the Individual General Partners from personal liability through a transfer.
Allowing the transfer to discharge the Individual General Partners' personal liability would, on the other hand, do violence to the Loan Agreement and other documents signed contemporaneously with the Loan Agreement. The Promissory Note (the "Note") executed by Statewide specifically provides that the partnership agrees to pay the entire amount of the *70 Loan. Under New Jersey general partnership law, that repayment obligation runs both to the Statewide partnership and to the Individual General Partners who are personally and jointly liable for the full amount of the Note. N.J.S.A. 42:1-15. The Note contains no language limiting this promise to pay.
In short, even if extrinsic evidence were considered, there was no proof of any agreement to give the Individual General Partners an option to terminate their personal liability. They were experienced real estate developers, familiar with large transactions, and were aware and warranted to each other that they understood that they might be required to individually guarantee the Loan. Indeed, the Individual General Partners have admitted that they were personally liable at least from 1988 through 1991 on the loan, and they have made personal payments toward the debt service on the permanent Loan from June 15, 1989 to the present. Manifestly, if they were never personally liable, then no limitation on personal liability would have been necessary. The end result is that the plaintiffs' claim that they were relieved of liability under the Loan Agreement or Note is not supported by the law of general partnership, the agreements of the parties, or by general equitable principles.
Stability and certainty are fundamental needs in public bond issues, and plaintiffs' position conflicts with these imperatives. Under the "New Jersey Economic Development Authority Act," the NJEDA is "constituted as an instrumentality of the State exercising public and essential governmental functions, and... [its] exercise of the powers conferred by this act shall be deemed and held to be an essential governmental function of the State." N.J.S.A. 34:1B-4. The NJEDA is empowered to issue bonds, N.J.S.A. 34:1B-9, and the Act sets forth legislative findings, including that the
"provision of buildings ... to increase opportunity for employment in ... service enterprises in the State is in the public interest and it is a public purpose for the State to induce and to accelerate opportunity for employment in such enterprises ... [and that the] availability of financial assistance by the State *71 will reduce present unemployment and improve future employment opportunities by encouraging and inducing the undertaking of such construction projects...."
N.J.S.A. 34:1B-2(b) and (d).
The owner/developer of an eligible project receives the benefit of the Authority's financing for the project, presumably at a lower interest rate than the rates available from commercial sources due to the tax-exempt status of the bonds, whose sale provides the cash infusion to fund the project. The NJEDA is empowered by the Act "to secure the payment of the bonds" through various covenants, N.J.S.A. 34:1B-12. In its December 4, 1985 Resolution approving the transaction, which was approved by Governor Thomas H. Kean on December 12, 1985 (Exhibit P-1, Tab 1), the Authority declared in Section 3 that the bonds would be payable, among other sources, "out of the revenues or other receipts, funds, or monies derived from payments by the Borrower, pursuant to the Loan Agreement...."
Bond issues of public authorities such as the NJEDA are backed not by a state's full faith and credit but by a good faith covenant of the legislature, and in one case involving such a covenant our Supreme Court acknowledged that
if the constitutionally acceptable device of modern day progressive government, i.e., the financially independent authority, is to succeed in the expeditious accomplishment of public purpose projects, and in persuading investors to buy the authority's bonds, ... [t]he judicial branch of government, which has given its imprimatur to the constitutionality of the device, has the duty to declare invalid attempts at material subversion of the covenant.

New Jersey Sports & Exposition Authority v. McCrane, 61 N.J. 1, 29, 292 A.2d 545 (1972), appeal dismissed, 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972) (emphasis added).
Courts equally have the duty to interpret and enforce covenants and agreements that private parties make with public authorities, including private owner/developers of projects financed by the bonds of public authorities. The court must be vigilant to protect against the "material subversion" of a private owner/developer's covenant in such a transaction, so that *72 there is no thwarting of the "accomplishment of public purpose projects" which are made possible by "persuading investors to buy the authority's bonds," in the language of McCrane, supra.
It is essential to the public purposes and public policy of the legislation establishing financially independent public authorities that owner/developers who transact with a public authority in connection with its bond financing, and whose agreed liability in the transaction is to be a source of payment of the authority's bonds, not be judicially permitted to accomplish a "material subversion" of their covenants and agreements with the authority. See McCrane, supra, at 29, 292 A.2d 545. On the evidence presented, it is beyond legitimate dispute that the covenants and agreements of Statewide, which were binding personally on its general partners individually, were a material inducement to the transaction, including the NJEDA's ability to sell the bonds.[6]
Finally, the suggestions by plaintiffs to the effect that the Individual General Partners relied on advisors and did not read the documents in question are no defense to liability. Because the law does not give effect to secret, uncommunicated intentions, it would be incongruous to say the least if the ultimate secret intention in contract law  an intention not to be bound by the contract one has signed but not read  were accorded determinative effect. And indeed the law does not *73 permit a party who has signed a valid agreement later to be relieved from it on the basis of allegedly not having read it.
In the absence of "fraud or imposition," when one fails to read a contract before signing it, the provisions are nevertheless binding, and the party "is conclusively presumed to understand and assent to its terms and legal effect," as was reaffirmed in Rudbart v. North District Water Supply, 127 N.J. 344, 353, 605 A.2d 681 (1992) (quoting from Fivey v. Pennsylvania Railroad, 67 N.J.L. 627, 52 A. 472 (E. & A. 1902)); see also, Onderdonk v. Presbyterian Homes of New Jersey, 171 N.J. Super. 529, 410 A.2d 252 (App.Div. 1979) aff'd. in part, rev'd in part on other grounds, 85 N.J. 171, 425 A.2d 1057 (1981); Moreira Const. Co. v. Moretrench Corp., 97 N.J. Super. 391, 235 A.2d 211 (App.Div. 1967), aff'd. 51 N.J. 405, 241 A.2d 236 (1968); Wade v. Park View Inc., 25 N.J. Super. 433, 96 A.2d 450 (Law Div.), aff'd. 27 N.J. Super. 469, 99 A.2d 589 (App.Div. 1953). Even illiterate individuals have been held bound by a signed contract in the absence of misrepresentation. Modern Security Co. v. Lockett 143 A. 511 (N.J.Sup.Ct. 1928). One who signs a document in those circumstances should know its contents or have it read (or otherwise have the contents made known) to him or her. F.S.T. Corp. v. Onorato, 139 N.J. Eq. 195, 50 A.2d 467 (Ch. 1947).
Here, of course, there was no fraud or equitable estoppel. Reliance is an element of each (Carlsen v. Masters & Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979) (estoppel) and Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 51, 477 A.2d 1224 (1984) (fraud)), and the court has found that the Individual General Partners did not rely on alleged misstatements (or alleged omissions to state) on the part of Fidelity, and that they understood their personal liability as general partners of Statewide. Therefore, Statewide and the Individual General Partners are bound by the execution of the documents in question, which occurred in most if not all instances by one general partner signing on behalf of the entire partnership.

*74 C. Summary

The Individual General Partners' transfers of their Statewide partnership interests did not discharge them from their personal liability as partners under the Loan Agreement and Note executed by Statewide before the transfers.
NOTES
[1] Messrs. Pomeranc and Blaichman, for example, transferred their Statewide general partnership interests to a corporation owned by them named Vista Hotel Management Corporation.
[2] At the trial, the parties agreed that (a) prior to January 1992, no effective transfer could be made of the general partnership interests in Statewide, and (b) the Individual General Partners were liable as general partners for the obligations of the Borrower that were incurred prior to any transfer.
[3] The court decided this issue in favor of plaintiffs in its original opinion filed May 11, 1992, but that issue is not addressed at length in this abbreviated and revised version of that opinion.
[4] The NJEDA has never appeared in this action. The parties who participated in the trial stipulated, however, that with respect to the issues being tried, Fidelity had the same standing to assert the plaintiffs' alleged non-compliance with the Loan Agreement as the NJEDA would have had (as Section 10.6 of the Loan Agreement contemplates).
[5] Under the Mortgage and Security Agreement (the "Mortgage"), which is dated January 13, 1989, more than three years after the bond closing, Statewide and the Individual General Partners agreed to stand behind their repayment obligations under the Promissory Note, for not only does the Mortgage define the Mortgagor as "Statewide Realty Company, a New Jersey general partnership organized and existing under the laws of the State of New Jersey" (id., preamble), but Section 3.2 states:

... The terms "Mortgagor" when used herein shall include all persons liable for payment of the indebtedness or any part thereof, whether or not such persons shall have executed this Mortgage . ..,
and the term "all persons" includes the Individual General Partners.
[6] The plaintiff of course normally bears the burden of proof. In the context of the partnership covenants and agreements here, and the transaction in which they occurred, Statewide and the Individual General Partners should bear the burden of showing that that liability under the Loan, having been agreed to, thereafter has been discharged by an express agreement or course of dealing, and this would be true even if the declaratory judgment action had been filed by Fidelity rather than Statewide. The plaintiffs have failed to prove that the transfer has discharged their liability. The court is further persuaded by the evidence, however, even if it is assumed that Fidelity had the burden of proving non-discharge of personal liability instead of plaintiffs having to affirmatively prove a discharge, that Fidelity has shown that such a discharge has not occurred.