**Johnny and Tamara HAGER,**
**Plaintiffs,**

**v.**

**AMERICAN GENERAL FINANCE, INC., a corporation, and American General Home Equity, Inc., a corporation, Defendants.**

**Civil Action No. 2:97–0381.**

United States District Court,
S.D. West Virginia.

Jan. 7, 1999.

Daniel F. Hedges, Mountain State Justice, Inc., Charleston, WV, for plaintiffs.

Jeffrey K. Phillips, George E. Carenbaur, Jason H. Scott, Steptoe & Johnson, Charleston, WV, Thomas R. Goodwin, Richard D. Owen, Carrie G. Fenwick, Goodwin & Goodwin, Charleston, WV, Jack R. Wilson, III, T. Thomas Cottingham, III, Matthew P. McGuire, A. Meredith Barton, Hunton & Williams, Charlotte, NC, for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on defendants' motion for summary judgment, filed on August 14, 1998.

### I.

The following facts, as set forth in supporting affidavits and depositions on file, are presented in the light most favorable to the non-moving party. Plaintiffs are unsophisticated consumers with limited education. Mr. Hager has an eighth grade education and is unable to read or write. His wife is literate, having completed her education through the ninth grade. Despite her ability to read and write, Mrs. Hager is unable to understand the complexities associated with financial transactions.

In May of 1994, plaintiffs contacted American General Finance, Inc. ("AGF"), and requested a $2,500 loan to replace home furnishings lost by plaintiffs in a house fire. AGF's office manager, Earl Michael Pauley, met with and agreed to make the loan to plaintiffs, secured by the title to plaintiffs' mobile home. On May 24, 1994, plaintiffs closed this loan with AGF, at which time plaintiffs signed various loan documents, including a joint loan application, term life insurance applications, term life insurance statements of policy costs and benefits, and a federal disclosure statement.[1] Plaintiffs were instructed by Mr. Pauley as to where to sign each of these documents and they did so without taking the opportunity to review any of the documents in detail. Plaintiffs were told by Mr. Pauley that credit life insurance was mandatory in order for them to obtain the loan. Consequently, plaintiffs agreed to purchase credit life insurance in connection with this loan and signed the box on the federal disclosure

---

1. The federal disclosure statement sets forth the total amount financed, the finance charge, the annual percentage rate, and the total amount of all payments made through maturity of the loan. In addition, it is the federal disclosure statement that includes a provision whereby the debtors may select credit life insurance by signing a box that states "We want credit life insurance."

statement acknowledging that "We want credit life insurance."

In addition to the principal amount of this loan, plaintiffs were charged an investigative fee of $54.83, a document fee of $10.00, credit life insurance premiums of $69.50, and term life insurance premiums of $162.00. The total amount financed by plaintiffs was $2,741.50. Plaintiffs were to make twenty-four monthly payments of $166.98 per month. Upon consummation of the loan, Mr. Pauley told plaintiffs they could contact AGF for more money without incurring any additional fees in the event they could not replace their belongings for $2,500.

Nine days later, plaintiffs contacted AGF and requested an additional loan for $1,500. On June 3, 1994, AGF refinanced plaintiffs' original loan and increased the principal balance by an additional $1,500. At this time, plaintiffs signed various loan documents, including a promissory note and security agreement[2], term life insurance applications, term life insurance statements of policy costs and benefits, and a federal disclosure statement. Plaintiffs were instructed by Mr. Pauley as to where to sign and they did so without reviewing the forms. Plaintiffs were told by Mr. Pauley that credit life insurance was mandatory on this loan and, as a result, they purchased credit life insurance with respect to this loan and signed the box on the federal disclosure statement selecting the insurance. In conjunction with this loan, plaintiffs were charged an investigative fee of $92.75, credit life insurance premiums of $232.47, and single term

life insurance premiums of $162 .00. The total amount financed was $4,637.65, to be repaid over a forty-two month period at $164.25 per month. This loan remained secured by plaintiffs' mobile home with no additional security taken by AGF at the time.

Approximately six weeks later, plaintiffs sought from AGF an additional loan to cover the cost of school clothes for their children. On July 20, 1994, plaintiffs borrowed $529.13 from AGF, and executed at closing various loan documents, including a promissory note and security agreement, term life insurance applications, term life insurance statements of policy costs and benefits, and a federal disclosure statement by which they selected credit life insurance after being told by Mr. Pauley that it was mandatory in this instance. Plaintiffs again signed the loan documents without reviewing them. Plaintiffs were charged a document fee of $10.00 and credit life insurance premiums of $3.00 on this loan. The total amount financed was $542.13, to be repaid at $105.81 per month over a six month term. AGF took a security interest in plaintiffs' vehicle as collateral for this loan.

In November of 1994, plaintiffs requested that AGF consolidate their existing loans after being informed by Mr. Pauley that consolidation would reduce their monthly payments. On November 7, 1994, plaintiffs' loans of June 3, 1994, and July 20, 1994, were consolidated into a new loan funded by defendant American General Home Equity, Inc. ("AGE"), an affiliate of AGF. This loan was secured by plaintiffs'

**2.** AGF's standard form promissory note and security agreement includes on page 2 the following acknowledgment: "You understand that credit insurance is not required in connection with this loan and was not a factor in the approval of the extension of credit, and that you may obtain such insurance, if you want it, from any person you choose. If you have chosen to obtain credit insurance through us, then (a) your choice to obtain such credit insurance through us is indicated on a separately signed Insurance Notice, a copy of which has been given to you, and (b)

the cost of such credit insurance is included within the Amount Financed shown on the reverse side, and is shown on the separate Insurance Notice." (*See* Defendant's Motion for Summary Judgment, Exhibit 5). Also included within the form is the following language: "You also acknowledge that no employee of ours has made any statement or representation to you which contradicts or is inconsistent with the express terms of this document or any related disclosure document." (*See Id.*).

mobile home, vehicle, and a deed of trust on plaintiffs' residence. Plaintiffs signed various loan documents associated with this loan, including a loan application, a promissory note and security agreement, a federal disclosure statement, a notice of right to cancel, a settlement statement, a title insurance election form, a deed of trust, term life insurance applications, and term life insurance statements of policy costs and benefits. As with the other loans, plaintiffs were instructed where to sign and did so without first reviewing the documents. Upon belief that credit life insurance was mandatory, plaintiffs again purchased this insurance and signed the box on the federal disclosure statement indicating "We want credit life insurance." In connection with this loan, plaintiffs were charged an investigative fee of $280.00, a document fee of $24.50, a title examination fee of $125.00, credit life insurance premiums of $644.55, and title insurance premiums of $20.00. The total amount financed was $7,814.05. Plaintiffs were to make sixty monthly installments of $228.08 per month on this loan.

In April of 1995, plaintiffs requested a loan in the amount of $800.00 from AGF to pay for vehicle repairs. This loan request was approved and funds were advanced to plaintiffs on April 11, 1995. As with the other loans, plaintiffs purchased credit life insurance, believing it to be mandatory in order to qualify for the loan, and signed the box acknowledging "We want credit life insurance." At this time, plaintiffs were charged an investigative fee of $16.39, a document fee of $10.00, credit life insurance premiums of $9.44, and term life insurance premiums of $63.69. The total amount financed was $819.44, to be repaid at $78.68 per month for twelve months.

On August 25, 1995, plaintiffs' loans of November 7, 1994, and April 11, 1995, were consolidated by AGE. According to plaintiffs, Mr. Pauley suggested that they consolidate these loans in order to reduce their monthly payments. At this time, plaintiffs executed a loan application, a promissory note and security agreement, a federal disclosure statement by which they indicated their desire to purchase credit life insurance, a notice of right to cancel, a settlement statement, a title insurance election form, a deed of trust, term life insurance applications, and statements of term life insurance benefits and costs. As with each of the other loans obtained from defendants, plaintiffs were told by Mr. Pauley that the purchase of credit life insurance was mandatory. As before, plaintiffs signed these documents without reviewing them. In connection with this loan, plaintiffs were charged a document fee of $24.50, a title examination fee of $125.00, credit life insurance premiums of $1,007.29, and title insurance premiums of $23.00. The total amount refinanced was $9,384.89. This loan was to be repaid over seventy-two months, at a monthly payment amount of $251.17.

Plaintiffs provided defendants with a notice of cancellation of their loans on or about March 21, 1997, by which they directed that all further communications be made through their attorney. Notwithstanding this direction, Mr. Pauley contacted plaintiffs on March 25, 1997, and March 26, 1997, regarding their account. This action was ultimately filed by plaintiffs on April 15, 1997.

In their complaint, plaintiffs assert two federal claims for alleged violations of the Truth in Lending Act and Regulation Z. Specifically, Count I alleges that defendants failed to properly disclose the finance charges associated with each of the loans made to plaintiffs, while Count II alleges that defendants failed to offer plaintiffs written rights of rescission with respect to their loans and failed to make material disclosures to plaintiffs, all in direct violation of the Truth in Lending Act and Regulation Z. Plaintiffs also assert three state law claims, including Count III unconscionability, Count IV fraud, and Count V unlawful debt collection practices. Defendants move for summary judgment on each of plaintiffs' claims.

## II.

### A. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a party fails to establish an essential element of the cause of action, the opposing party is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That is, a defendant satisfies its requirement as a matter of law by demonstrating that there is an absence of evidence to support the plaintiff's claims. *Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994), *cert. denied,* 513 U.S. 1191, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995). A defendant is also entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the plaintiff. *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable jury to return a verdict in favor of the plaintiff. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is also not appropriate even if there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn from them. *Overstreet v. Kentucky Cent. Life Ins. Co.,* 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), nor make determinations of credibility, *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir.1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). Inferences that are "drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

### B. Truth in Lending Claims

Count I of plaintiffs' complaint alleges violations of the Truth in Lending Act and Regulation Z as a result of defendants' failure to include the credit life insurance premiums in the finance charge for each of plaintiffs' loans. Plaintiffs claim that they were told by Mr. Pauley that credit life insurance was required in order for them to qualify for the loans. (Compl. ¶¶ 5–9; Plaintiffs' Affidavit in opposition to Defendants' Motion for Summary Judgment, ¶ 6). According to plaintiffs, mandatory credit life insurance premiums must be included as part of the finance charge and not the amount financed. (Compl. ¶ 12). By failing to include these premiums in the finance charge, plaintiffs claim that the disclosed annual percentage rate on each loan is less than the actual rate plaintiffs are being charged. (*Id.*).

Section 106 of the Truth in Lending Act ("TILA") requires, in pertinent part, that:

Charges or premiums for credit life, accident, or health insurance written in connection with any consumer credit transaction shall be included in the finance charge unless (1) the coverage of the debtor by the insurance is not a factor in the approval by the credit of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and (2) in order to obtain the insurance in connection with the extension of credit, the person to whom the

credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof.

15 U.S.C. § 1605(b).

The parallel provision contained in Regulation Z, as promulgated by the Board of Governors of the Federal Reserve Board, and set forth in 12 C.F.R. § 226.1 *et seq.*, provides that:

> Premiums for credit life, accident, health, or loss-of-income insurance may be excluded from the finance charge if ... [t]he insurance coverage is not required by the creditor, and this fact is disclosed in writing....

12 C.F.R. § 226.4(d)(1)(i).

While the TILA and Regulation Z do not proscribe the practice of requiring credit life insurance as a condition for the extension of credit, if such insurance is in fact required as a condition of the loan, then the cost of the insurance must be included in the finance charge and not in the amount financed.

Defendants argue that, as a matter of law, they were not required to include the cost of the insurance in the finance charge inasmuch as plaintiffs affirmatively indicated their desire to purchase credit life insurance and expressly acknowledged in writing that the insurance was not a factor in defendants' approval of the loans. In support of their assertion, defendants point to the language contained within the federal disclosure statements and promissory notes and security agreements executed by plaintiffs in connection with their loans. *See supra* n. 1 and 2.

Plaintiffs do not dispute that they signed documents indicating their desire to purchase credit life insurance. They contend, however, that they did not want to buy such insurance, but did so based upon the representations of Mr. Pauley that the insurance was required as a condition of their loans. (Johnny Hager Depo., pp. 7–8, 10, 12, 16; Tamara Hager Depo., pp. 8, 33; Plaintiffs' Affidavit in Opposition to Defendants' Motion for Summary Judgment, ¶ 6). Thus, according to plaintiffs, a genuine issue of material fact exists as to whether or not they voluntarily elected to purchase credit life insurance.

■ Generally, disclosures similar to the ones provided by defendants satisfy the requirements of the TILA and insulate a lender from liability. *See, e.g., Doggett v. Ritter Finance Co.,* 528 F.2d 860 (4th Cir. 1975) (holding that lender satisfied the TILA by obtaining debtor's signature on form stating that credit life and disability insurance was not required to obtain the loan); *USLIFE Credit Corp. v. FTC,* 599 F.2d 1387 (5th Cir.1979) (finding that lender met TILA requirements by having debtor sign contract which clearly disclosed that lender did not require credit life insurance as a condition to the loan). However, if a lender misrepresents to its customers that insurance is required, even though the loan contracts unequivocally state that the purchase of insurance is optional, a violation of the TILA may be established. *See, e.g., Milbourne v. Mid–Penn Consumer Discount Co.,* 108 B.R. 522 (Bankr.E.D.Pa.1989) (holding that the execution by debtor of an affirmative written indication of a desire to purchase credit life insurance does not insulate a lender who misinforms its customers from liability); *Marine Midland Bank v. Burley,* 73 A.D.2d 1041, 425 N.Y.S.2d 429 (N.Y.App. Div.1980) (finding summary judgment inappropriate in light of evidence that plaintiff was told that credit life insurance was required as a condition precedent to his loan despite fact that consumer credit contract stated otherwise); *Mims v. Dixie Finance Corp.,* 426 F.Supp. 627 (N.D.Ga. 1976) (allowing debtor to provide oral testimony regarding the circumstances under which credit life insurance was purchased despite a signed statement that the purchase was voluntary); *In Re Peacock Buick, Inc.,* 86 F.T.C. 1532 (1975) (holding that auto dealership which falsely informed its customers that credit life insurance was required despite contract language to the

contrary was liable for unfair trade practices).

A reasonable finder of fact, considering the facts in the light most favorable to plaintiffs, could come to the conclusion that defendants required plaintiffs to purchase credit life insurance. Plaintiffs allege that Mr. Pauley told them that credit life insurance was mandatory and that they would not have purchased the insurance otherwise. Those facts could reasonably lead a jury to the conclusion that defendants violated the TILA and Regulation Z by failing to include the credit life insurance premiums in the finance charge of each loan. Because a reasonable finder of fact could conclude that defendants required credit life insurance and that the premiums for this insurance should have been added into the finance charge, a question of fact exists regarding defendants' liability on this issue. Thus, summary judgment with respect to Count I of plaintiffs' complaint is not appropriate.

■ Count II of plaintiffs' complaint alleges that defendants failed to provide plaintiffs with written rights of rescission with respect to each loan and failed to make all mandatory disclosures to plaintiffs in violation of the TILA and Regulation Z. (Compl.¶ 15). As a result of defendants' alleged failure to make these disclosures, plaintiffs claim that their March 21, 1997, cancellation was timely and seek declaratory judgment on this issue. Defendants argue that they disclosed all information to plaintiffs, including notices of their rights to rescind, in accordance with the TILA and therefore plaintiffs had only three days from the consummation of each loan to rescind. Defendants claim that, inasmuch as plaintiffs did not forward their notice of cancellation to defendants until March of 1997, plaintiffs' rescission was untimely and ineffective as a matter of law.

Section 125 of the TILA provides, in relevant part, that:

In the case of any consumer credit transaction ... in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor ... of his intention to do so. The creditor shall clearly and conspicuously disclose ... to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide ... appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a).

In the event that the lender fails to make all material disclosures to the debtor, the right to rescind is extended from three days to three years. 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3). "Material disclosures" under the TILA are defined to include the annual percentage rate, the finance charge, the amount financed, the total payments, and the payment schedule. 12 C.F.R. § 226.23(a)(3) n. 48.

Here, plaintiffs obtained their first loan from defendants on May 24, 1994, and their last on August 25, 1995. Plaintiffs forwarded their notice of rescission to defendants on or about March 21, 1997, within a period of three years from the date of their first loan with defendants. Inasmuch as a reasonable finder of fact could conclude that defendants failed to properly disclose the finance charges to plaintiffs, the court also finds that a reasonable finder of fact could conclude that defendants failed to make all material disclosures to plaintiffs, thereby extending their time to

rescind from three days to three years. Consequently, summary judgment is inappropriate with respect to Count II of plaintiffs' complaint.

## C. *Unconscionability Claim*

■ Count III of plaintiffs' complaint alleges that the transactions entered into by plaintiffs giving rise to their loans with defendants were unconscionable in violation of the West Virginia Consumer Credit and Protection Act. (Compl.¶ 18). Specifically, plaintiffs contend that defendants induced plaintiffs to enter into high interest rate loans and to mortgage their residence without realizing the magnitude of the debt they were incurring or the ramifications of these transactions. (Compl.¶¶ 2, 17).

The West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A–1–1 *et seq.*, provides:

(1) With respect to a transaction which is or gives rise to a consumer credit sale or consumer loan, if the court as a matter of law finds:

 (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or

 (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement. without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.

(2) If it is claimed or appears to the court that the agreement or transaction or any term or part thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose and effect to aid the court in making the determination.

W.Va.Code § 46A–2–121 (1996).

■ "The principle of unconscionability is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position." *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 369 S.E.2d 882, 885 (1988). In determining whether conduct is unconscionable, the court must consider "whether, in light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract." *Id.* (citing Uniform Consumer Credit Code, § 5.108 comment 3, 7A U.L.A. 170 (1974)). An analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole. *Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749, 753 (1986).

■ A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs. *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co.*, 186 W.Va. 613, 413 S.E.2d 670, 675 (1991). A bargain may be unconscionable if there is "gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party...." *Troy Mining*, 346 S.E.2d at 753. Gross inadequacy in bargaining power may exist where consumers are totally ignorant of the implications of what they are signing, *Board of Educ. of Berkeley County v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439, 447 (1977),

or where the parties involved in the transaction include a national corporate lender on one side and unsophisticated, uneducated consumers on the other, *Arnold v. United Companies Lending Corp.*, 511 S.E.2d 854 (W.Va.1998).

Defendants argue that plaintiffs have failed to allege specific facts which would create an issue of fact regarding whether the defendants' conduct was unconscionable. Specifically, defendants contend that plaintiffs have come forward with no evidence that plaintiffs were oppressed or unfairly surprised by defendants conduct, that the loan contracts executed by plaintiffs were overwhelmingly one sided, or that the respective bargaining power of the parties was grossly unequal, so as to overcome summary judgment on this issue.

Plaintiffs argue that unconscionability cannot be determined at the summary judgment stage in this case inasmuch as plaintiffs have not yet had an opportunity to fully present evidence on this issue to the court. In West Virginia, unconscionability is a question of law to be determined based on the factual circumstances of the case. While the court does not accept plaintiffs' suggestion that summary judgment is inappropriate with respect to a determination of unconscionability, the court, viewing the evidence in the light most favorable to plaintiffs, does find that a question of fact exists as to whether the parties' bargaining power was grossly unequal so as to render the transactions between the plaintiffs and defendants unconscionable. Plaintiffs are unsophisticated, uneducated consumers who allegedly signed documents without understanding the implications of what they were signing. The court further finds that a question of

fact exists as to whether plaintiffs had any other meaningful financing alternatives available to them. The record reflects that plaintiffs lost their possessions in a house fire and were in need of financial assistance. Plaintiffs' total monthly income is only $796 per month. Based upon the immediacy of plaintiffs' economic needs, and their lack of financial resources, it is questionable whether or not plaintiffs were in a position to obtain loans from any other lending institution. In fact, there is at least some indication that plaintiffs had applied, but were rejected, for loans from other lenders. (Johnny Hager Depo., p. 29). Inasmuch as the evidence before the court suggests that the bargaining power of the plaintiffs may have been grossly inadequate and that the plaintiffs may not have had any meaningful alternative to obtaining the loans from defendants, a question of fact exists as to whether the transactions were unconscionable. Consequently, summary judgment as to Count III of plaintiffs' complaint is not appropriate.

### D. *Fraud Claim*

Count IV of plaintiffs' complaint alleges that the defendants suppressed material facts when encouraging plaintiffs to refinance their loans, including the fact that refinancing was more costly to plaintiffs than borrowing additional funds by separate loans. (Compl.¶ 21). Plaintiffs' Count IV fraud claim is also based, in part, on allegations that defendants suppressed from plaintiffs their practice of "loan flipping." [3] (*Id.*) In addition to allegations of material suppressions, plaintiffs' fraud claim also incorporates by reference allegations that defendants made material misrepresentations to plaintiffs concerning

---

**3.** Loan flipping is a term used by plaintiffs to describe the process by which loan charges and fees associated with earlier loans are added into the balance of new loans, including additional loan charges and fees generated by the new loans, thereby significantly increasing the cost of borrowed funds. According to plaintiffs, defendants have a man-

agement-directed goal of flipping at least 4% of all loans each month, or 48% percent of all loans each year, which plaintiffs allege they should have been made aware of at the time they refinanced their loans. (Compl. ¶¶ 1, 22; Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 20).

the necessity of purchasing credit life insurance and their ability to obtain additional funds without incurring duplicative loan fees and charges. (Compl.¶¶ 5, 6, 9).

■ Under West Virginia law, the essential elements of fraud include the following:

(1) that the act claimed to be fraudulent was the act of defendant or induced by him;

(2) that it was material and false and plaintiff relied upon it; and

(3) that plaintiff was damaged because he relied upon it.

*Cordial v. Ernst & Young,* 199 W.Va. 119, 483 S.E.2d 248 (1996).

Plaintiffs' fraud claim is based, in part, on allegations that defendants made affirmative misrepresentations concerning the necessity of purchasing credit life insurance and plaintiffs' ability to obtain a second loan without incurring additional fees or charges. Defendants argue that, as a matter of law, plaintiffs could not have reasonably relied upon these alleged misrepresentations when deciding to enter into the loan transactions with defendants inasmuch as they signed contracts which acknowledged that "no employee of [defendants] has made any statement or representation ... which contradicts or is inconsistent with the express terms of this document or any related disclosure document." (Defendants' Memorandum in Support of Motion for Summary Judgment, Exh. 5, 9, 12, and 21). According to defendants, plaintiffs should not be allowed to disaffirm the language contained within the contracts by simply contending that they did not read the documents prior to signing them.

■ It is a widely accepted principle of contracts that, absent fraud or other wrongful conduct, one who signs or accepts a written instrument will normally be bound in accordance with its written terms and cannot disaffirm the contract simply by contending that he failed to read the contract or understand its contents. *Acme*

*Food Co. v. Older,* 64 W.Va. 255, 61 S.E. 235 (1908). This principle has been extended to cases where the person who signs the contract is illiterate; in such cases, the individual has a responsibility to have the contract read to him. *Hutchins v. TNT/Reddaway Truck Line, Inc.,* 939 F.Supp. 721, 724 (N.D.Cal.1996); *Statewide Realty Co. v. Fidelity Management and Research Co., Inc.,* 259 N.J.Super. 59, 611 A.2d 158, 165 (Law Div.1992); *Gaskin v. Stumm Handel GmbH,* 390 F.Supp. 361, 366 (S.D.N.Y.1975). Avoidance of the contract is proper, however, if it can be shown that the other party deceived the illiterate as to the contents of the contract. *Gaskin,* 390 F.Supp. at 366.

Plaintiffs claim that Mr. Pauley told them that credit life insurance was mandatory in order to qualify for each of the loans and that they would not have purchased the insurance otherwise. (Plaintiffs' Affidavit in Opposition to Defendants' Motion for Summary Judgment, ¶ 6). A reasonable finder of fact, viewing the evidence in light most favorable to plaintiffs, could find that Mr. Pauley deceived plaintiffs into believing that the insurance was mandatory and that plaintiffs reasonably relied upon his statements when deciding to purchase credit life insurance, notwithstanding contract language to the contrary. Thus, summary judgment is not appropriate as to Count IV of plaintiffs' complaint.

It should be noted that defendants argue that plaintiffs' fraud claim must fail as a matter of law inasmuch as plaintiffs have brought forward no evidence that defendants owed a fiduciary duty to plaintiffs to disclose alternative financing arrangements or defendants' loan flipping practices during the course of these transactions. Inasmuch as plaintiffs' fraud claim is based, in part, on allegations of affirmative misrepresentations, the court does not find persuasive defendants' argument that plaintiffs' fraud claim must fail due to the absence of a confidential relationship between the parties since the existence of

such a relationship is not a required element for a claim of fraud based upon material misrepresentations.

### E. *Unfair Debt Collection Practices Claim*

██ Count V of plaintiffs' complaint alleges that defendants violated the West Virginia Consumer Credit and Protection Act by contacting plaintiffs about their past due account despite having been provided notice that plaintiffs had retained an attorney.

The West Virginia Consumer Credit and Protection Act provides, in pertinent part, that:

> No debt collector shall use unfair or unconscionable means to collect or attempt to collect any claim. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section:
>
> \* \* \* \* \* \*
>
> (e) Any communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known, or could be easily ascertained, unless the attorney fails to answer correspondence, return phone calls or discuss the obligation in question or unless the attorney consents to direct communication.

W.Va.Code § 46A–2–128 (1996).

Defendants argue that, as a matter of law, they did not engage in unfair debt collection practices inasmuch as their communications with plaintiffs were not initiated as an attempt to collect on plaintiffs' debt. Defendants do not dispute that they received a letter from plaintiffs on or about March 25, 1997, which directed all further communications to plaintiffs' counsel. It is also undisputed that two telephone calls were made to plaintiffs on or about this same date. Defendants contend that these conversations were limited to the preparation of release documents requested by plaintiffs. (Pauley Depo., pp.

53–54). Plaintiffs maintain, however, that these calls were made in an effort to collect on their past due debt. (Tamara Hager Depo., pp. 35–36). Inasmuch as a genuine issue exists as to whether defendants placed calls to plaintiffs in an attempt to collect on their past due debt after receiving notice that plaintiffs had retained an attorney, summary judgment as to Count V is inappropriate.

### III.

For the reasons stated, it is ORDERED that defendants' motion for summary judgment be, and it hereby is, denied.

The Clerk is directed to forward copies of this order to all counsel of record.