James P. **KNAPP** and Pamela K. **Knapp, Plaintiffs,**

v.

**AMERICAN GENERAL FINANCE INC., and American General Home Equity, Inc., Defendants.**

No. CIV. A. 2:99–0571.

United States District Court, S.D. West Virginia, Charleston Division.

Aug. 16, 2000.

Daniel F. Hedges, Charleston, WV, for Plaintiffs.

Thomas R. Goodwin, Richard D. Owen, Carrie G. Fenwick, Goodwin & Goodwin, Charleston, WV, T.Thomas Cottingham, Matthew P. McGuire, A. Meredith Barton, Hunton & Williams, Richmond, VA, for Defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendants' motion for summary judgment on all issues. The Court **GRANTS** the motion on Count IV, breach of fiduciary relationship, but **DENIES** it on all other claims and counts.

### I. FACTUAL BACKGROUND

The facts are presented and viewed in a light most favorable to non-movants. The married Plaintiffs sought to borrow a thousand dollars ($1000) to purchase new tires and have money for the Christmas season. They are the parents of five children, ranging in age from 7 to 20. James Knapp telephoned American General Home Equity, Inc. (AGHE) where some-

one took loan application information and responded the loan was approved.

On November 26, 1997 the Knapps visited the AGHE office in Charleston, where they signed numerous loan documents. The amount financed included:

1) life insurance (James Knapp)
Merit Life, premium: $119.10
2) life insurance (Pamela Knapp)
Merit Life, premium: $102.30
3) life insurance (joint) · premium: $ 25.47
4) property insurance ($1700 coverage) premium: $ 64.13
5) non-filing insurance premium: $ 4.00

Total insurance $315.00

The total amount financed was $1353.83, at an annual percentage rate of 30.99%. Loan proceeds of $1,038.83 were actually paid out to the Knapps.

The loan disclosure statement contained a very small print notice:

INSURANCE: Credit life insurance, credit disability insurance, and/or credit involuntary unemployment insurance are not required to obtain credit and will not be provided unless you sign and agree to pay the additional cost. You understand that we and our insurance affiliate anticipate profits from the sale of credit insurance, and you consent thereto if you select such insurance.

The Knapps signed just below under a typed-in statement: "We want joint decreasing credit life insurance." Down within the midst of more small print was a notice in centered caps:

PERSONAL PROPERTY INSURANCE DISCLOSURE

Beneath that was another diminutive statement:

You are not required to purchase property insurance on your household goods to secure this loan. If you choose to have such insurance, you may obtain the insurance from anyone you want. You should consider any homeowner's or other insurance which you may already have when deciding to purchase insurance with this loan.

Once again the Knapps signed under a very small type statement: "You want property insurance."

The Knapps also executed a separate "Non-compulsory Insurance Voluntarily Purchased by the Applicant Schedule" for single-interest property insurance, marking an "X" next to the statement "I do not have any valid insurance to offer the creditor." In fact, the Knapps had prior homeowner's insurance coverage in effect. Finally, the Knapps signed an "Insurance Disclosure Summary" which proclaimed in bold type:

**I WANT TO PURCHASE THE INSURANCE NOTED BELOW AND HAVE THE INSURANCE PREMIUM FINANCED AS PART OF MY LOAN. I FULLY UNDERSTAND THAT I DO NOT HAVE TO PURCHASE ANY OF THE FOLLOWING INSURANCE TO GET MY LOAN.**

The credit life, credit personal property, and two Merit L.I.F.E. Plus insurance policies, the latter for each Plaintiff, are listed on this document.

Pamela Knapp cannot read or write. As evidenced in her deposition, she has trouble spelling her own name aloud, but she does know how to sign her name. Mr. Knapp attended school through the eighth grade, but cannot see without glasses, and he had none when he signed these documents. Mr. Knapp testified, while he and his wife completed the loan documents, he informed the person with whom he was dealing that he couldn't see the documents. "And she said, 'Well, I'll tell you,' and then she talked to me and I signed it." Mrs. Knapp also told "the girl across the table" she could not read. That person said she would go over the papers and explain things. Both Knapps testify they were told they had to have insurance to get the loan.

The Note and Security Agreement has an "X" typed in a box indicating: "To secure this loan, you give to Payee a security interest under the Uniform Commercial Code in the following personal proper-

ty." However, no property is listed on this form in the box below. The Federal Disclosure Statement, however, lists: "2 pc fishing tackle, weedeater, fisher CD, pioneer stereo, 2 RCA 19 in tv's." The Knapps testify they never owned, nor suggested they owned, any of this property except a Pioneer stereo. They testify they were informed by AGHE's agent that she needed to "put some stuff on there to make it look good so the loan will go through." Plaintiffs were not given a copy of this document, so they never saw the putative property listing. A Personal Property Appraisal signed by the Knapps also lists the same items of property. Jennifer Mullins, an agent of AGHE, whose name is signed on the form as witnessing it, testified that she did not witness the signing of the document, but signed as a witness some time later and that she backdated her signature to the date of the Knapps' loan closing.

After making payments of ninety-five dollars ($95.00) a month for five months, the Knapps fell behind in their loan payments. In November 1998, American General Finance (AGF) hired Troy Mynes of Surveillance Technologies to collect or repossess the Knapps' collateral. Mynes went to the Knapps' residence numerous times to collect loan payments or the collateral. Prior to his last visit, Jennifer Mullins told him to "Knock on the door 'til you get them mad enough to come to the door or until they call the Police Department.... That way, that will at least get them outside and then you can get to the property."

Plaintiffs brought this civil action alleging fraud, unconscionable agreement, unfair or deceptive acts or procedures in the sale of insurance, breach of fiduciary relationship, and breach of duty of good faith and fair dealing. Defendants move for summary judgment on all counts.

## II. DISCUSSION

### A. Summary Judgment Standard

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.,* 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn,* 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which re-

main to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.* 57 F.3d 1317, 1323 (4th Cir.1995). It is through this analytical prism the Court evaluates the parties' motions.

## B. American General Finance as a Proper Party

AGF seeks summary judgment on all claims, arguing it is not a proper party because 1) all Plaintiffs' dealings were with AGHE, not AGF; and 2) AGHE, not AGF, is listed on all documents as the creditor and payee. The documents before the Court belie both assertions.

The loan application, note and security agreement, federal disclosure statement, insurance disclosure summary, authorization to repossess agreement, and personal property appraisal all have the "American General" logo on them. The logo says

### AMERICAN GENERAL

in block letters. To the left of the words, "American General," in an attached square is a wheel, darkened between the spokes. Most of these documents identify American General Home Equity of 310 Hills Plaza, Charleston, West Virginia as the corporate entity involved. The insurance disclosure statement with the identical logo, however, shows American General Finance of 601 NW 2nd Street, Evansville, IN as the entity involved in the transaction. Although the Notice of Default and Consumer's Right to Cure does not display the logo, it has "American General Finance" emblazoned in large letters on the top right of the notice sent from American General Home Equity. The Authorization to Repossess agreement (with the American General logo) shows it was "American General Finance," at the 310 Hills Plaza address in Charleston, who hired Surveillance Technologies to collect the Knapps' collateral. Finally, the Merit life insurance sold to the Knapps as part of their loan agreement was purchased from Merit Life Insurance Co., which the small print shows to be "a subsidiary of American General Corporation," also at the 601 NW Second Street address in Evansville.

AGF and AGHE may be separate corporations for some purposes, registered respectively in Delaware and West Virginia, as Defendants represent. Nevertheless, questions of material fact remain as to why the companies share a logo and sometimes an address, and why AGF undertook to repossess collateral of a loan in which it claims it had no dealings and to which it was not a party. Accordingly, the Court **DENIES** American General Finance's motion on all claims.

## C. Knapps' Reliance on Misrepresentation

To prove fraud under West Virginia law Plaintiffs must demonstrate:

(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying on it; and (3) that he was damaged because he relied on it.

*Cordial v. Ernst & Young,* 199 W.Va. 119, 130, 483 S.E.2d 248, 259 (1996) (citations omitted). Defendants argue the Knapps cannot show justifiable reliance on any alleged misrepresentation by AGHE that they had to purchase insurance to get the loan because 1) they signed numerous documents indicating they knew they did not have to purchase insurance, 2) they did not seek the help of a third party to read the documents to them, and 3) they did not inform AGHE of their inability to read the documents.

 It is a widely accepted principle of contracts that, "absent fraud or other wrongful conduct, one who signs or accepts a written instrument will normally be bound in accordance with its written terms and cannot disaffirm the contract simply by contending that he failed to read the

contract or understand its contents". *Hager v. American Gen. Fin., Inc.*, 37 F.Supp.2d 778, 788 (S.D.W.Va.1999) (citing *Acme Food Co. v. Older,* 64 W.Va. 255, 61 S.E. 235 (1908)). The principle applies where a person who signs a contract cannot read it; in such cases, the individual has a responsibility to have the contract read to him. *See Hager,* 37 F.Supp.2d at 788 (citing *Hutchins v. TNT/Reddaway Truck Line, Inc.,* 939 F.Supp. 721, 724 (N.D.Cal.1996); *Statewide Realty Co. v. Fidelity Management and Research Co., Inc.,* 259 N.J.Super. 59, 611 A.2d 158, 165 (Law Div.1992); *Gaskin v. Stumm Handel GmbH,* 390 F.Supp. 361, 366 (S.D.N.Y. 1975)). Avoidance of the contract may be proper, however, if it can be shown that the other party deceived the person who could not read the contract as to its contents. *Id.* (citing *Gaskin,* 390 F.Supp. at 366).

■ Mr. Knapp testified he notified the loan closing agent he could not read the documents and she said, "Well, I'll tell you," and then she talked to the Knapps and they signed the documents.[1] (Pls.' Resp., Ex. 1 at 72.) Mrs. Knapp testified she told the "girl sitting across the table" she could not read, and that person responded she did not care, they could go over the papers, and explain things. (Pls.' Resp., Ex. 4 at 16–17.) Both Knapps testified they were told they had to purchase the insurance to get the loan. Whether the Knapps' reliance on AGHE's alleged misrepresentation of the insurance requirements of the contract terms was justifiable poses a jury question. Accordingly, summary judgment is **DENIED** on this issue.

### C. Unconscionability

■ "The principle of unconscionability is one of the prevention of oppression and unfair surprise and not the disturbance of reasonable allocation of risks or reasonable advantage because of superior bargaining power or position." *Orlando v. Finance One of West Virginia, Inc.,* 179 W.Va. 447, 369 S.E.2d 882, 885 (1988). A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs. *Hager,* 37 F.Supp.2d at 786 (citing *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co.,* 186 W.Va. 613, 413 S.E.2d 670, 675 (1991)). "Gross inadequacy in bargaining power may exist where consumers are totally ignorant of the implications of what they are signing or where the parties involved in the transaction include a national corporate lender on one side and unsophisticated, uneducated consumers on the other." *Id.* (citations omitted).

■ Defendants argue Plaintiffs have come forward with no evidence of oppression, unfair surprise or one-sidedness. They assert Plaintiffs were experienced borrowers, who acknowledged obtaining loans and credit from other companies in the past. Indeed, both Knapps conceded they believed such insurance was a mandatory part of obtaining loans because they had signed such agreements on other occasions. This testimony may be susceptible of conflicting inferences, but it does not demonstrate indisputably these consumers, one illiterate and the other with an eighth-grade education, were sophisticated consumers, able to hold their own in bargaining with loan company representatives.

Defendants next argue the parties executed standard loan documents with full disclosures as required by law. Because Plaintiffs point to no particular provision in their loan agreement that was unfair, Defendants maintain the contract cannot be

---

1. The fact Mr. Knapp may have believed the name of the person with whom they dealt was "Christy Moss" rather than Camille Wilder, who actually signed the documents, is of no moment. Mr. Knapp identified the person whom he told he could not read as the person who sat across the table from him and closed the loan, whatever that person's name may have been. (*See* Pls.' Resp., Ex. 1 at 70, 71, 79, 80.)

unconscionable, citing *Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986):

> A finding that the transaction was flawed, however, still depends on the existence of unfair terms in the contract. A litigant who complains that he was forced to enter into a fair agreement will find no relief on grounds of unconscionability.

*Id.*

 Unconscionability does not, however, manifest only in the contracting, nor only in the contract. As the Restatement of Contracts (Second) instructs:

> A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But *gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party,* may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. *Factors which may contribute to a finding of unconscionability in the bargaining process include … knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.*

Restatement (Second) of Contracts § 208 cmt. d (1981) (emphasis added). A contract containing facially innocuous insurance purchases may be unconscionable, and unfair, if entered into due to fraudulent misrepresentation that the insurance was necessary, when it was not.

Accordingly, summary judgment on the issue of unconscionability is **DENIED.**

## D. Statute of Limitations for Unfair Trade Practices Act

The statute of limitations for claims arising under the West Virginia Unfair Trade Practices Act (UTPA), West Virginia Code §§ 33–11–1 *et seq.*, is one year. *See Wilt v. State Auto. Mut. Ins. Co.*, 203 W.Va. 165, 506 S.E.2d 608 (1998). Because the Knapps' loan agreement was entered into on November 26, 1997 and this action was not brought until May 21, 1999, Defendants argue their UTPA claim should be barred by the statute of limitations.

 In a variety of cases, however, the Supreme Court of Appeals of West Virginia has applied the Discovery Rule, holding that "a right of action does not 'accrue' until the plaintiffs knew or should have known by the exercise of reasonable diligence of the nature of their claims." *Stemple v. Dobson*, 184 W.Va. 317, 320, 400 S.E.2d 561, 564 (1990). To benefit from the tolling grace of the rule, a plaintiff "must make a strong showing of fraudulent concealment, inability to comprehend the injury, or other extreme hardship." *Cart v. Marcum*, 188 W.Va. 241, 245, 423 S.E.2d 644, 648 (1992). "Where a cause of action is based on a claim of fraud, the statute of limitations does not begin to run until the injured person knows, or by the exercise of reasonable diligence should know, of the nature of his injury, and determining that point in time is a question of fact to be answered by the jury." *Stemple*, 184 W.Va. at 321, 400 S.E.2d at 565.

 The Knapps claim Defendants' sale of insurance to them was based on a fraudulent affirmative oral misrepresentation of contracts which Defendants knew the Knapps were incapable of reading and deciphering for themselves. These allegations are sufficient to invoke the discovery rule. The time at which the statute begins or began to run is thus a jury question. Summary judgment is inappropriate.

### E. Breach of Fiduciary Duty

 Plaintiffs claim Defendants breached a fiduciary duty toward them by forcing insurance on them in addition to extending the loan for which Plaintiffs originally contacted them. The fiduciary duty is " '[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.' " *Elmore v. State Farm Mut. Automobile Ins. Co.*, 202 W.Va. 430, 435, 504 S.E.2d 893, 898 (1998) (quoting Black's Law Dictionary. 625 (6th ed.1990)). A fiduciary relationship exists "whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another." *McKinley v. Lynch*, 58 W.Va. 44, 57, 51 S.E. 4, 9 (1905). "As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." *Id.* (quoting C.J.S. Fiduciary at 385 (1961)).

 As Defendants contend, the law does not generally recognize a fiduciary relation between creditor and debtor, the fundamental relation between Defendants and the Knapps. *See ARA Automotive Group v. Central Garage, Inc.*, 124 F.3d 720, 728 n. 13 (5th Cir.1997); *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir.1988) (creditor-debtor relationships rarely found to give rise to a fiduciary duty). Plaintiffs counter, however, the Defendants exceeded the creditor-debtor relationship when they undertook to sell Knapps unnecessary property and life insurance, thus creating a quasi-fiduciary duty. The case Plaintiffs cite for this proposition, however, finds its quasi-fiduciary relationship in the special circumstances and entire pattern of the dealings between an individual borrower and a savings and loan association. *See Hutson v. Wenatchee Fed. Sav. and Loan Ass'n*, 22 Wash.App. 91, 588 P.2d 1192 (1978). No unusual, special, or unique circumstances are alleged in the Knapps' relation to De-

fendants beyond their contentions that the Knapps were unsophisticated, uneducated borrowers, unable to determine for themselves the terms of their loan agreements.

 As sellers of insurance, however, Defendants might be characterized as insurance agents or brokers for the policies they sold. The identity of Merit Life as a subsidiary of AGF further supports this characterization. It is well established that an insurance professional owes a duty to his principal to exercise reasonable skill, care and diligence in effecting insurance. *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1470 n. 15 (4th Cir.1996) (citing 16A John Alan Appleman and Jean Appleman, Insurance Law and Practice § 8841 (1981)) (other citations omitted). Claims invoking the duty, however, are a sub-species of the general cause of action for professional malpractice, which may be brought against any professional who fails to exercise the knowledge, skill and care ordinarily employed by members of his profession. *See id.* (citing W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 32 (5th ed.1984)).

 As lenders, Defendants have a common law duty not to defraud their creditors. Defendants are not—and did not hold themselves out to be—caregivers for their customers. In the commercial setting, the classic warning, *caveat emptor*, reminds the buyer the seller is not necessarily his friend, much less his guardian or trustee.

Accordingly, Defendants' motion for summary judgment on Count IV of Plaintiffs' complaint, alleging breach of fiduciary relationship, is **GRANTED**.

### F. Breach of Duty of Good Faith and Fair Dealing

Finally, Plaintiffs allege the contract between the parties contained an implied provision requiring Defendants to exercise good faith and fair dealing in the performance of its contractual obligations, a duty breached when Defendants sought to re-

possess property based on an invalid security agreement and a bogus personal property appraisal, by employing an agent whom they directed to harass Plaintiffs.

■ West Virginia recognizes the rule that "in every contract there exists an implied covenant of good faith and fair dealing."[2] *Harless v. First Nat. Bank in Fairmont,* 162 W.Va. 116, 122, 246 S.E.2d 270, 274 (1978). Good faith and fair dealing are pervasive requirements in the law; parties to contracts or commercial transactions are bound by this standard. *See Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977) (collecting cases finding requirement of good faith in a variety of contracts). Under the Uniform Commercial Code, "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." W. Va.Code § 46–1–203. The secured transactions that generated this litigation are covered in Article 9 of Chapter 46 of the *Code.*

### 1. Valid security agreement

Defendants argue a valid security agreement existed, embodied in three documents: the note and security agreement, the federal disclosure statement, and the personal property appraisal. These separate documents, they argue, should be construed together and considered to constitute one agreement where the parties and the subject matter are the same and there is clearly a relationship among the documents, citing *McDaniel v. Kleiss,* 202 W.Va. 272, 278, 503 S.E.2d 840, 846 (1998).

The note and security agreement contains an "X" in the box preceding the language: "To secure this loan you give to Payee a security interest . . . in the following personal property," however, no personal property is listed thereunder. While the federal disclosure statement provided by Defendants does list "2 pc fishing tack-

le, weedeater, fisher CD, pioneer stereo, 2 RCA 19 in tv's," Plaintiffs state the disclosure statement provided to them did not disclose any security. Michael Pauley, who describes himself as branch manager of "American General," (Pls.' Resp., Ex 5 at 3), testified personal property might not be listed on the federal disclosure statement given to the borrower "when we didn't have the personal property list before the loan was run." The personal property appraisal form was signed by Jennifer Mullins, who testified she signed the document, supposedly as a witness to the closing, more than a year later and that she backdated it to November 1997. She conceded it was blank when she signed it. (*Id.,* Ex. 2 at 5–7.) Plaintiffs also testified except for the Pioneer stereo they owned none of this property, but the American General agent said she needed to "put some stuff on there to make it look good so the loan will go through." As noted, Plaintiffs were never given a copy of the personal property listing. Manager Pauley asserted the company did not require him to give a copy of this form to customers and the form was not part of the loan documents the customer receives. (*Id.,* Ex. 5 at 14–15.)

■ There is a genuine issue of material fact whether Defendants had a valid security interest in the property they undertook to repossess and, thus, a further question whether Defendants breached the duty of good faith and fair dealing. Summary judgment on this issue is inappropriate as well.

### 2. Troy Mynes as employee

Finally, Defendants propose that collection agent Troy Mynes was an independent contractor not their employee and, accordingly, Defendants cannot be liable for any of his actions.

---

**2.** A promise implied by law from whatever is written is a written contract within the ten-year statute of limitations of W. Va.Code § 55–2–6. *See Houston v. Lawhead,* 116

W.Va. 652, 182 S.E. 780 (1935). Thus, Defendants' argument that the one-year limitation of section 55–2–12 bars this cause of action fails.

Ordinarily, when one person is retained to perform certain services for another, the relationship of employer and employee exists. *Myers v. Workmen's Compensation Comm'r,* 150 W.Va. 563, 567, 148 S.E.2d 664, 666 (1966). The controlling factor in determining the status of a workman is whether the hiring party retains the right to control and supervise the work to be done. *Id.* The right to control and supervise the work is the determinative factor; whether the control is actually exercised is unimportant. *Id.* (citations omitted).

Mynes' company, Surveillance Technologies, was hired by American General Finance "to collect or repossess, on sight, the .... collateral which is held by AGF as security for a defaulted contract." Mynes was the company's sole employee. Mynes testified that when people offered to pay he could not approve the amounts or the time of payment, but had to call one of Defendants' agents to make that decision. (Pls.' Resp., Ex. 5 at 121–22.) He also testified he called them for direction: "you know, this is what's happening, you know. What do you want to do?" (*Id.* at 123.)

Regarding the Knapps, Mynes testified Jennifer Mullins, agent for AGHE, told him to "Knock on the door or until they call the Police Department.... That way, that will at least get them outside and then you can get to the property." (*Id.* at 165.) Despite the factors Defendants identify that indicate Mynes' independent operation of his business, there remains a genuine issue of material fact whether Mynes was Defendants' employee with regard to these repossessions. Summary judgment is not appropriate and must be **DENIED.**

### III. CONCLUSION

Defendants' motion for summary judgment is **GRANTED** in part as to Count IV. As to all other Counts, it is **DENIED.**

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post it for publication on the Court's website at http://www.wvsd.uscourts.gov.